[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14901

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 10, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00380-CV-RDP

SUZANNE LEE,

                                                        Plaintiff-Appellant,

versus

BELLSOUTH TELECOMMUNICATIONS, INC.,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 10, 2009)

Before TJOFLAT and MARCUS, Circuit Judges,  and VINSON,* District Judge.

---

* Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

PER CURIAM:

At issue in this Employee Retirement Income Security Act of 1974 ("ERISA") case is whether BellSouth Telecommunications, Inc. ("BellSouth") improperly denied benefits to Suzanne Lee, a BellSouth employee who suffers from chronic pain syndrome, under both its Short Term Disability Plan ("SD Plan") and Long Term Disability Plan ("LD Plan"). The district court granted summary judgment to BellSouth, determining that Lee was not eligible for disability benefits because she failed to submit "objective medical evidence" of her claimed medical condition as required by the terms of the SD Plan. After thorough review, we conclude that BellSouth acted arbitrarily and capriciously in denying Lee's claim for SD Plan benefits since the undisputed record is filled with objective medical evidence of her disability and, therefore, that Lee was entitled to SD Plan benefits from January 25, 2005 through July 19, 2005. We also reverse the district court's entry of summary judgment for BellSouth concerning its denial of Lee's claim to SD Plan benefits after July 19, 2005, and its denial of Lee's claim to LD Plan benefits, and remand for further proceedings consistent with this opinion.

I.

The lengthy medical history necessary to resolving this lawsuit includes

these essential facts. BellSouth's active employees are provided with disability benefits through the BellSouth Corporation Health Care Trust – Employees (the "Trust"), which is sponsored and contributed to by many BellSouth affiliate companies. BellSouth hired Broadspire Services, Inc. ("Broadspire") to administer the Trust and, with respect to the SD Plan, specifically granted it "all discretionary authority and powers necessary to enable it to carry out its duties and discharge its responsibilities under the Plan," including deciding all questions of benefit eligibility. (BellSouth SD Plan § 6.1).

Under the terms of the SD Plan, an employee is entitled to disability benefits if she suffers from "a medical condition supported by objective medical evidence, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement." (BellSouth SD Plan § 2.10). The phrase "any type of work" means the participant's regular job with or without accommodations, any other job at a participating company (regardless of availability) with or without accommodations, and temporarily modified duties. (Id.).

Under the Long Term Disability Plan, "disability" is defined as "a continuous physical or mental illness, whether work related or non-work related,

2

which renders a Participant unable to perform any type of work other than one that pays less than half of his Annual Compensation at the time his benefits under the [SD] Plan began." (BellSouth LD Plan § 2.12). A BellSouth employee would not be eligible for LD Plan benefits unless she has first exhausted all fifty-two available weeks of SD Plan benefits. (BellSouth LD Plan § 2.28).

Suzanne Lee was a BellSouth employee from July 5, 1994 until May 4, 2005; during most of that time she was employed in a management position. Lee was notified by letter on May 10, 2005 that her employment with BellSouth was terminated effective May 4, 2005, because she failed to return to work full-time after the period of medical leave BellSouth was required to give her under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., had expired.

Lee was first absent from work due to chronic pain on January 18, 2005. On January 24, 2005, she filed an SD Plan benefits claim related to that chronic pain, which would have become effective the following day if it were approved and would have excused her continuing absence from work. But on February 4, 2005, Broadspire denied Lee's SD Plan benefits claim saying that it had not received the information it had requested from Lee's medical care providers. Then, on February 25, 2005, Broadspire informed Lee that its Appeals Review Committee ("ARC") had received her medical records, but, without a formal appeal request

3

from Lee, they would not be reviewed.  On April 26, 2005, Lee's FMLA medical leave expired, and she formally appealed the denial of her SD Plan benefits claim.

Along with her application for benefits and her appeal, Lee presented a variety of detailed statements and records from many treating physicians.  First, Dr. Cheryl Goyne of the Birmingham Pain Center offered the following letter dated February 3, 2005:

> I have been treating Ms. Suzanne Lee for her chronic pain syndrome since January 28, 2004.  She suffers from chronic thoracic spine pain secondary to thoracic disc disease.  Unfortunately, despite her treatment, she has persistent, intractable pain.  It is my understanding that she is unable to sit for more than 1 ½ hours at a time.  She cannot stand for more than 15 minutes or walk for more than 10-15 minutes at a time.  She is unable to work for more than 2-4 hours a day.

(Doc. 14 Ex. 1 at BRO193).

Next, an attending physician report completed for Suzanne Lee at the Birmingham Pain Center on February 7, 2005 summarized the results of a number of functional impairment tests administered to Lee.  (Doc. 14 Ex. 1 at BRO200). Among other things, this report observed that Lee could lift no more than 10 pounds, carry no more than 10 pounds, sit for no more than 15 minutes, and stand for no more than 10 minutes.  Moreover, it opined that Lee could rarely bend or stoop, push or pull, complete repetitive motions, undertake fine manipulation, or climb or traverse heights.  Finally, it said that Lee could only occasionally walk or

4

reach and that she could not drive a car or operate machinery.

Third, Dr. Wayne Grossman, another treating physician, submitted the following detailed statement in support of her claim on February 7, 2005:

Su[z]anne Lee has seen me on three occasions in the context of her treatment here at the Birmingham Pain center, first in August and November of 2004 and most recently January 20th, 2005 . . . . It was apparent from the very beginning that, in addition to being very anxious and upset about her pain and physical limitations, she had very severe muscle spasm complicating her treatment. She was placed on Valium for the treatment of her anxiety and muscle spasm. She reported a remarkable improvement, at the cost of some element of sedation . . . . Currently, she obtains some element of relief, only at the cost of seriously limiting sedation . . . .

More importantly, however, it became clear at our most recent appointment, that this lady seriously understates her difficulties . . . . She reported improvement . . . and fought hard, but I think much of her reported improvement was wishful thinking . . . . At her most recent appointment, after her Valium had been decreased because of sedation, she was in extreme pain, splinting nearly every movement, and could hardly talk or breath smoothly because of the severity of the spasm. This was my first occasion to see her walk into my office . . . . I was so alarmed at how unsteady and limited her gait was; I almost got a nurse to assist. I did assist her myself. Asking details about this, I felt the need to discuss it with her boyfriend, both because of her difficulty breathing and my desire for another's perspective. He related that she is this way most of the time . . . . I further discovered, that though she has seen herself as fully employed, her employer has been accommodating her in exceptional ways, and she has only been working 2-3 hours per day for more than a year. If her productivity has been in any way acceptable during this period, I expect it is only because of her drive and determination . . . . Dr. Goyne has recommended a program of exercise and stretching that, though it may be helpful, is not compatible with her work schedule, limited as it is . . . .

5

_I think it is clear that she needs to go on disability and discontinue trying to work part time. She is already extremely limited as it is, and she needs to be able to focus on her treatment and salvaging what functioning she can. This is a long term, possibly permanent treatment necessity_ . . . .

Her mother confirmed that the condition she has been in when she comes for her appointments is in fact her normal state.

I would add that she has problems with concentration and memory and this is common with depression and severe chronic pain . . . .

Finally, I have had an opportunity to see Dr. Goyne's note, discussing the patient's report that she is able to sit for 1 ½ hours at a time. It should be noted that she is only able to sit that long with sedating medications, extreme distracting pain, or both.

(Doc. 14 Ex. 1 at BRO198-99) (emphasis added).

Fourth, Dr. Michael Gibson submitted the findings of his review of Lee's medical charts at the Birmingham Pain Center. He wrote:

Lee's first visit was 1/20/04 where she was evaluated by Dr. Goyne and found to have disabling upper thoracic spine pain without myelopathy . . . . It is very clear that this condition has worsened between November 10, 2003 and February 2004, at least based on the basis of the [MRI] readings by the radiologist . . . . Her pain complaints are very consistent with her medical findings and I would rate them as very severe. In fact she rates her pain 10/10 despite treatment . . . . As far as her ability to work, it is very clear that this woman is permanently and totally disabled because of this condition. She will be disabled for greater than two years and therefore meets all Department of Labor criteria for vocationally disabled, especially when considering the severity of her depression as well as the severity of her pain and lack of control. She has marked dysfunction physically as a result of the thoracic disc herniation. These are

6

exquisitely painful problems and most people who have these become permanently and totally disabled as a result thereof because there is no definitive treatment for it.

(Doc. 14 Ex. 1 at BRO211-12).

Additionally, a thoracic MRI of Lee was taken on April 5, 2005 and the accompanying medical report showed right-sided and left-sided disc herniations. Another treating physician, Dr. Keith Howard Langford offered these observations:

The pain has remained in the same area ever since but at first was intermittent . . . . It is a sharp pain like a knife and when extremely severe or aggravated it runs through the chest to the front but does not radiate . . . .

[S]he has been treated for this severe chronic pain and is on heavy narcotic doses with Oxycontin . . . . The pain is so intense that any movement will aggravate it . . . . She has to have help with practically everything . . . .

Added to this constant pain is a collection of pains which she concludes are the result of positions she is forced to remain in to avoid aggravating her pain. The most severe of these is a pain at the base of her left thumb where there is a certain amount of swelling to be seen . . . .

The other important thing to note is that the patient moves with extreme care and when I entered the examination room, she was sitting on the couch with her back against the wall and was virtually immobile and even her speech was very limited since even this seemed to aggravate her pain to some degree. She walked down the corridor with very great care not to cause any increase or aggravation and I would say she showed every evidence of being in extreme pain despite the medication.

(Doc. 14 Ex. 1 at BRO213, BRO218).

7

On April 30, 2005, a CAT Scan of Lee's spine was taken. It revealed disc herniations and protrusions that led Dr. Pritchard, a physician at the Kirklin Neurosurgery Clinic, to recommend thoracic discectomy surgery. The surgery was conducted on Lee's back on May 16, 2005. (Doc. 14 Ex. 1 at BRO221-24).

Finally, Lee submitted supporting medical evidence documenting that she had suffered from chronic pain and degenerative disc disease since at least October 2003. Dr. Bradly S. Goodman, who treated Lee at the Alabama Orthopedic and Spine Center, submitted reports dating back to October 2003 and opining that Lee had been diagnosed with "chronic thoracic back pain" and "degenerative disc disease" for which she was treated with an "epidural steroid injection." (Doc. 14 Ex. 1 at BRO87-90). However, this treatment proved unsuccessful, and Dr. Goodman observed that Lee remained "in severe distress secondary to pain," had an "extremely slowed" gait, and "demonstrate[d] significant pain behaviors." (Doc. 14 Ex. 1 at BRO89). A November 10, 2003 MRI showed that Lee had "left paracentral disc protrusion" and "left paracentral disc bulge." (Doc. 14 Ex. 1 at BRO91).

In addition, on January 26, 2004, Lee attempted to participate in a Functional Capacity Evaluation at Bledsoe Tate Rehabilitation, Inc., but the accompanying report found that Lee was

> unable to be assessed for functional abilities secondary to subjective reports of pain and increased complaints from benign tasks. Functional motions were insufficient to assess lifting . . . . Gait was aberrant and appeared more as a shuffle as opposed to attempt to reduce stance on either side.

(Doc. 14 Ex. 1 at BRO77). Still another MRI, taken on February 20, 2004, revealed two paracentral herniated discs, which, in the words of Dr. Gibson, made it "clear that [Lee's] condition has worsened between November 10, 2003 and February 2004." (Doc. 14 Ex. 1 at BRO211).

Broadspire first addressed Lee's appeal of the denial of her SD Plan benefits claim when, on February 17, 2005, it asked Dr. Gerald Goldberg to perform a peer review of her medical records to determine if "[b]ased on the documentation, job description and peer to peer (when applicable) . . . the information support[s] a functional impairment from 1/18/2005 to the present." (Doc. 14 Ex. 2 at BRO201). Dr. Goldberg concluded that Lee "[f]ail[ed] to support impairment for [the] entire time frame," purportedly because the pain symptoms she and her physicians had detailed far exceeded the nature of the abnormalities described in her MRI reports. (Id.). He stated that "[n]o neurologic deficits are present and based on the information that is available; there is a lack of objective data to support disability from any occupation as of January 18, 2005 onward." (Id.) (emphasis added). On May 19, 2005, Broadspire notified Lee that her appeal was being placed on hold

9

until it received all of the materials Lee wished to present from her medical care providers. But, because BellSouth terminated Lee's employment due to her failure to return to work on May 4, 2005, Broadspire ceased contacting her medical care providers.

On July 19, 2005, as part of the review of Lee's case by the Broadspire Appeals Review Committee, Dr. Vaughn Cohan performed a peer review of Lee's medical records. (Doc. 14 Ex. 2 at BRO234-37). Dr. Cohan found that the medical data in fact supported a finding of disability under the SD Plan from May 16, 2005 to the time of his review, but did not support such a finding for the time period from January 25, 2005 to May 15, 2005. (Id.). While Dr. Cohan acknowledged that both Dr. Grossman and Dr. Goyne had reported that Lee was able to sit for only one-and-one-half hours at a time, that she required analgesic and muscle relaxant medications, and noted that Lee could not work for more than two-to-four hours per-day, he concluded that these "statements are obviously a reflection of the claimant's subjective reports to them, and they do not provide any objective documentation to substantiate their statements that the claimant is unable to work." (Id. at BRO235). Dr. Cohan also determined that these limitations were consistent with a sedentary job. Finally, Dr. Cohan adopted Dr. Goldberg's conclusion that "the documentation did not demonstrate objective evidence of a

10

functional impairment which would preclude work." (Id.).

On August 5, 2005, the ARC upheld the denial of Lee's claim for SD Plan benefits from January 25, 2005 to May 4, 2005, concluding that there was no objective evidence of functional impairment that would have precluded Lee from working during that time frame. The denial letter noted that, although three of Lee's treating physicians had opined that she was unable to work due to chronic pain, those physicians "did not provide any objective documentation to substantiate their statements that [she was] unable to work." (Doc. 14 Ex. 2 at BRO240-41). The ARC also said that Lee's limitations were consistent with being able to perform a sedentary job. More specifically, the ARC found that Lee's medical records failed to include a "description of an examination of the back in terms of response to palpation, range of motion testing, or presence or absence of muscle spasm," and likewise failed to reference a description of muscle power sensation being tested. (Id. at BRO240). Finally, the ARC observed that Lee's thoracic spine MRIs did not "indicate[] a degree of severity of pain consistent with [Lee's] complaints or a degree of severity of pain which would be inconsistent with work." (Id.).

In response to the denial of benefits, Lee filed this lawsuit against BellSouth in the United States District Court for the Northern District of Alabama, alleging

11

that BellSouth arbitrarily and capriciously denied her benefits both under the SD and LD Plans, all in violation of ERISA, 29 U.S.C. § 1001 et seq. On cross-motions for summary judgment, the district court denied Lee's motion but granted BellSouth's, upholding BellSouth's denial of benefits to Lee. In particular, after concluding that an arbitrary and capricious standard of review applied to the case, the district court held that BellSouth had acted reasonably in denying Lee's SD Plan benefits claim. It observed that Broadspire had conducted a "thorough analysis" of Lee's medical records in drawing the conclusion that, although Lee's physicians chronicled her severe pain and related physical impairments, they never provided objective evidence that she was unable to perform sedentary employment.

The district court also determined that BellSouth acted reasonably in denying Lee's LD Plan benefits claim, because an employee would be eligible for LD Plan benefits only if she had first exhausted all fifty-two weeks of SD Plan benefits; a requirement Lee could not meet because, the district court held, she was not entitled to any SD Plan benefits in the first place.

This timely appeal ensued.

## II.

ERISA does not promulgate the standards against which a court should measure an administrator's decision denying benefits. Firestone Tire & Rubber

12

Co. v. Bruch, 489 U.S. 101, 108-09 (1989). In this Circuit, however, we have

adopted the following mode of analysis to review an administrator's decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.

Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004),

abrogated on other grounds by Met. Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008)

(footnotes omitted). Moreover, if there is a conflict of interest, then the reviewing

court must consider the conflict as being a factor in determining whether the plan

administrator has acted arbitrarily and capriciously. Met. Life Ins. Co.,128 S. Ct at

2346; White v. Coca-Cola Co., 542 F.3d 848, 853-54 (11th Cir. 2008). And

because this case has come to us on an award of summary judgment, we review the

13

district court's determination de novo, viewing the facts in the light most favorable to the non-movant and applying the same legal standards that governed the district court's decision. Williams, 373 F.3d at 1134.

A.

On this record, BellSouth plainly granted an independent administrator -- Broadspire -- unfettered discretion to determine eligibility for SD Plan benefits. Therefore, our analysis must ask whether Broadspire's decision to deny Lee's claim for SD Plan benefits was arbitrary and capricious.[1]

Under arbitrary and capricious review, "the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision." Oliver v. Coca Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007), reh'g granted and partially vacated on other grounds, 506 F.3d 1316 (11th Cir. 2007) (quoting Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989)). "The district court's review of the plan administrator's denial of benefits should be limited to consideration of the material available to the

---

[1] "To trigger [the arbitrary and capricious] standard of review, the language conferring discretion on the administrator must be express language unambiguous in its design." Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 912 (11th Cir. 1997) (internal quotation marks omitted). BellSouth granted to Broadspire "all discretionary authority and powers necessary to enable it to carry out its duties and discharge its responsibilities under the Plan," including deciding questions of eligibility under the SD Plan. (BellSouth SD Plan § 6.1). There is no evidence that BellSouth provided monetary or non-monetary incentives to Broadspire employees or members of the ARC in exchange for benefits denials.

14

administrator at the time it made its decision." Id. (internal quotation marks and brackets omitted). The first step in this inquiry is to look to the language of the SD Plan. See 29 U.S.C. § 1104(a)(1)(D) (stating that an ERISA fiduciary shall discharge its duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]").

Again, the pertinent part of the SD Plan says that an employee is entitled to disability benefits if she suffers from "a medical condition supported by objective medical evidence, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement." (BellSouth SD Plan § 2.10). The phrase "any type of work" means the participant's regular job with or without accommodations, any other job at a participating company (regardless of availability) with or without accommodations, and temporarily modified duties. (Id.). The plain reading of the word "disability" is that "objective medical evidence" is required only to confirm the existence of a "medical condition." The structure of the sentence makes it clear that the SD Plan does not require "objective medical evidence" that Lee is "unable to perform any type of work." Indeed, it would be impossible for "objective

15

medical evidence" to "make[] a Participant unable to perform any type of work" or to "result[] in a Participant receiving treatment." Instead, it is the "medical condition," which must be "supported by objective medical evidence," that makes a person unable to perform a job or necessitates treatment.

Thus, the first relevant question is whether it was reasonable for Broadspire to conclude that Lee had not provided "objective medical evidence" of chronic pain syndrome; not, as the district court suggested, whether it was reasonable for Broadspire to conclude that Lee did not provide "objective medical evidence" that she was unable to perform a sedentary job. Only once we determine whether Lee provided objective medical evidence of a medical condition do we examine whether that medical condition has rendered her unable to perform "any type of work."

Traditionally, laboratory and other quantitative medical testing, such as MRIs, CAT Scans, and functional impairment tests, are considered objective medical evidence. Oliver, 497 F.3d at 1197. In addition, under Oliver, the consistent diagnosis of chronic pain syndrome by Lee's physicians along with the consistent observations of physical manifestations of her condition do in fact constitute objective medical evidence. Id. This is so because

> much medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured. Indeed, the

16

only evidence of a qualifying disability may sometimes be the sort of evidence . . . characterize[d] as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms.

Id. at 1196. There is, quite simply, no laboratory dipstick test to diagnose chronic pain syndrome. Id. at 1196-97 (explaining that chronic pain syndrome is "not subject to diagnosis by 'objective' laboratory tests"); see generally Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997) ("It is now widely recognized in the medical and legal communities that there is no dipstick laboratory test for chronic fatigue syndrome. Because the disease, although universally recognized as a severe disability, has no known etiology, it would defeat the legitimate expectations of participants . . . to require those with CFS to make a showing of clinical evidence of such etiology as a condition of eligibility for LTD benefits.") (internal quotation marks and citations omitted). Chronic pain syndrome is a severely debilitating medical condition that may be fully diagnosed only through long-term clinical observation, a method employed by all of Lee's treating physicians at the Birmingham Pain Center.

Indeed, in Oliver we concluded that a plan administrator had acted arbitrarily and capriciously in denying benefits to a claimant who suffered from fibromyalgia and chronic pain syndrome on the ground that he had not provided "objective" evidence of his pain. We observed that the claimant had submitted

17

"uncontroverted medical evidence of the only sort available to prove his disability – including medical reports from multiple physicians stating that his reports of pain were consistent with their diagnoses and did not appear to be histrionic or exaggerated." Oliver, 497 F.3d at 1197 (internal quotation marks omitted). The claimant in Oliver successfully documented his diagnosis of fibromyalgia and chronic pain syndrome through "the medical opinions of numerous treating physicians based on examinations of Oliver, two positive EMGs, a nerve conduction test, and an MRI." Id.

Lee submitted reports from five treating physicians as well as other medical records pertaining to her condition. Not only do these medical reports and records repeatedly confirm that Lee suffered from extreme and wholly debilitating chronic thoracic pain that was manifested in obvious physical symptoms, they also contain the results of multiple medical tests run on Lee, including three MRIs, a CAT Scan, a completed functional impairment test documenting her muscle strength and abilities, an uncompleted functional impairment test, and the detection of a severe muscle spasm.

For example, Dr. Goyne found that Lee could not sit for more than an hour and a half at a time, stand for more than fifteen minutes, walk for more than ten to fifteen minutes at a time, or work for more than two to four hours per day. (Doc. 14

Ex. 1 at BRO193). Similarly, a Birmingham Pain Center attending physician found that Lee could lift no more than 10 pounds; carry no more than 10 pounds; sit for no more than 15 minutes; stand for no more than 10 minutes; could rarely bend or stoop, push or pull, complete repetitive motions, undertake fine manipulation, or climb or traverse heights; could only occasionally walk and reach; and could not drive a car or operate machinery. (Doc. 14 Ex. 1 at BRO200). Dr. Grossman also made similar findings, stating that Lee "had [a] very severe muscle spasm complicating her treatment" that impaired her ability to talk and breathe smoothly and could be treated only with narcotics that imposed "seriously limiting sedation" and that she could only sit for one-and-one-half hours at a time under either sedating medication or "extreme distracting pain." (Id. at BR0198-199). Dr. Gibson confirmed that her "pain complaints are very consistent with her medical findings," that they were "very severe," and that her condition had worsened over time, including a thoracic disc herniation that caused "marked dysfunction physically." (Id. at BRO211). Dr. Langford also observed that Lee's pain was "so intense that any movement will aggravate it" and that she is "virtually immobile" with limited speech capabilities. (Id. at BRO213, 218).

In addition, Lee submitted evidence that she was unable to complete a January 2004 functional impairment test, because her "[f]unctional motions were

insufficient to assess lifting" and her "[g]ait was aberrant and appeared more as a shuffle as opposed to attempt to reduce stance on either side." (Id. at BRO077). She also presented three MRI reports from November 2003, February 2004 and April 5, 2005 demonstrating progressively worsening right-sided and left-sided disc herniation and a CAT Scan of her spine, revealing disc herniations and protrusions. Indeed, it was the result of that CAT Scan that led Dr. Pritchard to recommend thoracic discectomy surgery, which occurred on May 16, 2005.

As the preceding examples amply demonstrate, Lee presented repeated evidence of medical tests and examinations completed by pain care specialists supporting a diagnosis of chronic pain syndrome arising from her upper thoracic region. Just like Oliver, there is no evidence in this case that we have seen disputing any of the observations and diagnoses made by the many physicians, and it is unclear what additional "objective" evidence of her condition Lee could have provided. 497 F.3d at 1197.

Finally, we can find nothing in the SD Plan excluding from its coverage pain-related disabilities such as chronic pain syndrome or other disorders that were not diagnosed by laboratory tests. Accordingly, it was arbitrary and capricious for BellSouth to deny Lee's SD Plan benefits claim on the ground that she failed to provide objective evidence of her chronic pain syndrome.

20

BellSouth further erred by relying on a peer review by Dr. Cohan that improperly found the observations of Dr. Grossman and Dr. Goyne to be no more than "a reflection of the claimant's subjective reports to them." Indeed, Dr. Grossman's report actually discredited Lee's subjective claims, explaining that "it became clear at our most recent appointment, that this lady seriously understates her difficulties." (Doc. 14 Ex. 1 at BRO198). Dr. Grossman went on to describe the undeniable outward manifestations of Lee's severe chronic pain: "[a]t her most recent appointment . . . she was . . . splinting nearly every movement, and could hardly talk or breath[e] smoothly because of the severity of the spasm . . . . I was so alarmed at how unsteady and limited her gait was; I almost got a nurse to assist. I did assist her myself." (Id.). This was not a restatement of something Lee had told her physician.

Similarly, Dr. Gibson's report stated that Lee's "pain complaints are very consistent with her medical findings and I would rate them as very severe." (Id. at BRO211). The statements offered by Lee's treating physicians were drawn from multiple clinical observations, not simply a compendium of Lee's statements.

B.

BellSouth also made an unreasonable determination when it concluded that Lee's medical condition did not render her "unable to perform any type of work."

21

It premised this conclusion on Dr. Goldberg's and Dr. Cohan's claim that Lee was capable of performing a "sedentary" job. However, in reaching this conclusion, the two peer reviewers never so much as addressed Lee's treating physicians' observations that Lee could sit for no more than one-and-one-half hours at a time, and could do that only under either heavy sedation or excruciating pain, and could work for no more than two to four hours per day. If Lee can sit for no more than one-and-one-half hours at a time, only under impairing heavy sedation or substantial pain, that alone undermines the finding that she can perform any job, sedentary or otherwise. See Oliver, 497 F.3d at 1198 ("If Oliver could not sit for more than an hour at a time, that fact would undermine a finding that he could perform his job, which required him to sit for five hours a day, five days a week.").

Moreover, the completed functional capability test indicated that Lee can lift no more than 10 pounds; carry no more than 10 pounds; stand for no more than 10 minutes; rarely bend or stoop, push or pull, complete repetitive motions, undertake fine manipulation, or climb or traverse heights; and only occasionally walk or reach. Nor is Lee capable of driving a car or operating machinery. Perhaps most significant, Lee's physicians have observed that she cannot move, speak, or breathe freely.

These symptoms make it overwhelmingly unlikely that Lee could undertake

22

any job in any workplace, even one that requires her to work only in a seated position for no more than an hour and a half at a time, and for no more than two to four hours total per day, all while heavily sedated. As Dr. Langford explained, Lee "has to have help with practically everything." (Doc. 14 Ex. 1 at BRO213). Finally, Dr. Grossman's statement that Lee "ha[d] only been working 2-3 hours per day for more than a year" before she went on medical leave in January 2005 confirms that Lee was unable to perform a sedentary job with any degree of success. (Id. at BRO198). This is particularly true, because the prescribed treatment for her chronic pain syndrome, according to Dr. Grossman, "is not compatible with her [previous two to three hour per day] work schedule, limited as it is." (Id.).

Simply put, Lee's medical condition is a disability under the SD Plan, because it renders her unable to perform "any type of work." BellSouth's denial of Lee's SD Plan benefits was arbitrary and capricious because it was based upon palpably flawed peer reviews that mischaracterized the evidence submitted, ignored objective evidence from many treating physicians, and declared that Lee could perform a sedentary job when the medical evidence from her treating physicians repeatedly and unambiguously contradicted that finding.

Since Lee was in fact eligible for SD Plan benefits from January 25, 2005 to

23

May 4, 2005, she is also entitled to those benefits from that time through July 19, 2005. This is so because Dr. Cohan, Broadspire's peer reviewer, concluded that Lee had met the SD Plan definition of disability for the time period from May 16, 2005 through at least July 19, 2005, the date of his review. However, Lee was not awarded those benefits, because only current BellSouth employees are eligible for benefits under the SD Plan and Lee had been fired by BellSouth on May 4, 2005, twelve days before Dr. Cohan determined she had met the SD Plan definition of disability. The only stated reason for Lee's firing was that she was absent from work without excuse; she had failed to return from medical leave for her chronic pain syndrome and BellSouth had determined that it was not a disability covered under the SD Plan so she was not eligible to take medical leave for that condition. Yet Lee did in fact have a valid claim for SD Plan benefits when she took the medical leave that was the stated cause of her firing; accordingly, her absence from work was excused and cannot form a valid basis for the termination of her employment and accompanying eligibility for SD Plan benefits. (Bell South SD Plan § 4.2 (explaining that eligibility for SD Plan benefits excuses absence from work for up to fifty-two weeks "as long as the Participant remains continually Disabled and otherwise meets the terms and conditions for Benefit payment")).

24

## C.

In short, the grant of summary judgment to BellSouth must be reversed in its entirety, because BellSouth acted arbitrarily and capriciously in denying Lee's claim for SD Plan benefits.  In addition, the denial of summary judgment to Lee on her claim for SD Plan benefits from January 25, 2005 through July 19, 2005 must be reversed and the case remanded for further proceedings consistent with this opinion.  Moreover, we remand the case to the district court to determine whether Lee is entitled to SD Plan benefits from July 19, 2005 through January 25, 2006, and whether Lee is entitled to LD Plan benefits beginning on January 26, 2006.

**REVERSED AND REMANDED.**

VINSON, District Judge, concurring *dubitante.*

I write separately because, while I agree with the result, this case is much closer than the majority opinion would suggest.

For its decision, the majority relies heavily on Oliver v. Coca Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007), reh'g granted and partially vacated on other grounds, 506 F.3d 1316 (11th Cir. 2007). In that case, another panel of this court held that a plan administrator acted arbitrarily and capriciously in denying disability benefits based on an alleged lack of objective evidence to corroborate the claimant's subjective complaints of pain. The case, however, is distinguishable from this case in one very important respect: unlike the plan here, the plan in Oliver did not require objective medical evidence. Rather, the recipient was only required to submit (1) a written application and (2) a medical certification of disability. Id. at 1196 (describing the two plan requirements and noting that "[no] provision of the Plan requires 'objective evidence' of disability"). In other words, "Oliver was entitled to disability payments so long as he submitted a written application and provided medical certification that he was 'disabled' within the meaning of the Plan." Id. Oliver did that, and the administrator acted arbitrarily and capriciously by adding an "objective evidence" requirement to the plan that did not otherwise exist. See id. at 1196-97 ("[W]e conclude that it was arbitrary and capricious to require [objective] evidence in the context of this Plan . . . ")

(emphasis added). However, <u>Oliver</u> went on to note that "in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering." <u>See</u> <u>id.</u> at 1197. Because the plan at issue here expressly required objective evidence, this case is quite different from <u>Oliver</u> and presents such a "context."[1]

My concern with the majority opinion is not only that it relies heavily on a case that is factually dissimilar in an important respect, but also that it goes further than is necessary to decide this case. It also appears to regard most of the medical evidence related to the attending physicians in this case as "objective" when, in fact, much of it is subjective. Whether and the extent to which Lee was in pain, and her stated difficulties working, walking, sitting, and breathing, are all Lee's own subjective evaluations of her condition, and are just reiterated by the doctor. For

---

[1] Disability cases now frequently involve one of these two relative newcomers to the lexicon of etiology, "fibromyalgia" and "chronic pain syndrome". I do not believe that this circuit's case law supports a different standard of evaluation for them, however, nor are they in any way "universally recognized" as severe disabling conditions. It is true, as the majority notes, that the <u>Oliver</u> court recognized that a condition such as chronic pain syndrome is "inherently 'subjective' [and] cannot be quantifiably measured." Thus, it may not be "subject to diagnosis by 'objective' laboratory tests." <u>See</u> 497 F.3d at 1196-97. But, as quoted in the text above, the court did not hold that objective evidence is never required to prove chronic pain syndrome, nor did it create a broad rule requiring administrators to credit, in such a case, a claimant's subjective complaints of pain. The court only found that in the context of the claimant's diagnosis and medical records, and under the terms of the plan at issue, the administrator's decision to deny benefits based on lack of "objective medical evidence" was arbitrary and capricious. This conclusion was also justified because there <u>was</u> objective evidence in <u>Oliver</u>, but the plan administrator "mischaracteriz[ed], "ignored," "did not acknowledge," "failed to mention," and "disregard[ed]" the medical evidence merely "in order to arrive at the conclusion it desired." <u>See</u> <u>id.</u> at 1197-99.

27

example, Dr. Goyne's own evaluation of these symptoms is, in fact, prefaced with "It is my understanding." The opinion also seems to imply that subjective evidence alone is sufficient to support a disability determination for a condition identified as chronic pain syndrome, which is contrary to my own interpretation of Eleventh Circuit law.

Importantly, however, there is a considerable amount of objective evidence in the record (e.g., Lee's muscle spasms, positive diagnostic tests, Dr. Wayne Grossman's observation and conclusion that she was perhaps understating her complaints, and most probative, the MRIs and CAT Scan that revealed the disc herniations and protrusions which ultimately led to her spinal surgery in May 2005). While, as the ARC observed, there was a noticeable absence of some of the medical tests one would expect to have been conducted for this type of condition, and perhaps some inconsistency between the physical evidence and the degree of the severity of Lee's indicated pain, the totality of the objective evidence does establish a condition which entitled Lee to SD Plan benefits under the Plan. Consequently, Lee's identified medical condition does have what I consider to be sufficient objective evidentiary support in the record, and I agree that reversal and remand is appropriate.