RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RAYMOND SHAW,

                 *Plaintiff-Appellant,*

    *v.*

AT&T UMBRELLA BENEFIT PLAN NO. 1,

                 *Defendant-Appellee.*

No. 14-2224

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-11461—Judith E. Levy, District Judge.

Argued: June 10, 2015

Decided and Filed: July 29, 2015

Before: COLE, Chief Judge; GILMAN and KETHLEDGE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Robert B. June, LAW OFFICE OF ROBERT JUNE, P.C., Ann Arbor, Michigan, for Appellant. Laura A. Lindner, LITTLER MENDELSON, P.C., Milwaukee, Wisconsin, for Appellee. **ON BRIEF:** Robert B. June, LAW OFFICE OF ROBERT JUNE, P.C., Ann Arbor, Michigan, for Appellant. Laura A. Lindner, LITTLER MENDELSON, P.C., Milwaukee, Wisconsin, for Appellee.

    COLE, C.J., delivered the opinion of the court which GILMAN, J., joined. KETHLEDGE, J. (pg. 19), delivered a separate dissenting opinion.

---

**OPINION**

---

COLE, Chief Judge.  Plaintiff Raymond Shaw sued defendant AT&T Umbrella Benefit Plan ("the Plan"), alleging that the Plan denied his claim for long-term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA").  The district court granted summary judgment to the Plan, finding that the Plan had properly denied Shaw benefits.  Because we find that the Plan acted arbitrarily and capriciously in denying Shaw LTD benefits, we reverse the district court's judgment.  Further, because Shaw has demonstrated that he was denied benefits to which he was clearly entitled, we remand this case to the district court and direct it to enter an order awarding Shaw LTD benefits.

## I.  BACKGROUND

Shaw is a 39-year-old male who was employed as a customer service representative for Michigan Bell until he stopped working as a result of chronic neck pain.  Shaw was covered under the AT&T Midwest Disability Benefits Program, a component of the AT&T Umbrella Benefit Plan No. 1.

### A.  Disability Plan

Under the disability plan, short-term disability ("STD") benefits of full or partial wage replacement are available to employees for up to 52 weeks.  To be eligible for STD benefits, an employee must have a "sickness, pregnancy, or an off-the-job illness or injury that prevents [him] from performing the duties of [his] job (or any other job assigned by the Company for which [he is] qualified) with or without reasonable accommodation."  (R. 15-5, PageID 1129.)  After STD benefits run out, an employee may be eligible for LTD benefits.  To be eligible for such benefits, an employee must have "an illness or injury, other than accidental injury arising out of and in the course of employment by the Company or a Participating Company, supported by objective Medical Documentation."  (*Id.* at 1142.)  Further, "[s]uch illness or injury [must] prevent[] [him] from engaging in any occupation or employment (with reasonable accommodation as determined by the Claims Administrator), for which [he is] qualified or may

reasonably become qualified based on education, training or experience." (*Id.*) In determining eligibility for either STD or LTD benefits, the Plan reserves the right to conduct its own "examination by a Physician chosen by the Claims Administrator, if the Claims Administrator determines that such an examination is necessary." (*Id.* at 1134, 1146.)

The disability plan provides that "[t]he Plan Administrator (or, in matters delegated to third parties, the third party that has been so delegated) will have sole discretion to interpret [the disability plan], including . . . determinations of coverage and eligibility for benefits, and determination of all relevant factual matters." (*Id.* at 1156.) The disability plan also states that "[t]he Claims Administrator has been delegated authority by the Plan Administrator to determine whether a particular Eligible Employee who has filed a claim for benefits is entitled to benefits" and that "[t]he Appeals Administrator has been delegated authority by the Plan Administrator to determine whether a claim was properly decided by the Claims Administrator." (*Id.*)

Sedgwick Claims Management Services, Inc. ("Sedgwick") is the third party that administers benefits claims and appeals. Sedgwick's AT&T Integrated Disability Service Center ("IDSC") handles disability-benefits claims. Sedgwick's Quality Review Unit ("QRU") decides appeals of denied disability claims.

### B. Shaw's STD Benefits

Shaw suffered from chronic neck pain for years. On August 12, 2009, Sedgwick contacted Shaw about his absence from work and informed him that he might be eligible for STD benefits. To qualify, Sedgwick told Shaw to submit medical documentation demonstrating that his illness or injury "prevents [him] from performing the duties of [his] job with or without reasonable accommodations." (R. 15-1, PageID 708.)

After "a thorough review" of Shaw's medical documentation, Sedgwick notified Shaw on September 17, 2009, that his STD benefits claim had been approved retroactively to August 7, 2009. Over the course of the next year, Sedgwick conducted various reviews and reapproved Shaw's STD benefits claim on numerous occasions.

Throughout his time receiving STD benefits, Shaw was treated by Dr. Laura Reincke, a family-medicine practitioner. Dr. Reincke ordered cervical epidural steroid injections to manage

his pain. According to Dr. Reincke, these injections helped, but Shaw was "still getting neck pain." (R. 14-1, PageID 131.) In her medical charts, Dr. Reincke reported that Shaw was unable to drive longer than a half-hour and could "only sit for 20 min[utes]" due to his condition. (R. 14-3, PageID 262.) In November 2009, Dr. Reincke recommended that Shaw contact Dr. Neil Pasia, an orthopedic specialist, for further evaluation.

Dr. Pasia examined Shaw in December 2009 and January 2010. On December 15, 2009, Dr. Pasia ordered an MRI of Shaw's cervical spine. The MRI revealed a "herniated nucleus pulposus at C6/7 causing right foraminal stenosis" and a "right paracentral disc bulge with effacement of the thecal sac." (R. 14-1, PageID 138.) A physical examination by Dr. Pasia also revealed "some paravertebral spasm at the base of the neck" and "limited range of motion with flexion, extension, rotation, and bending secondary to pain." (*Id.*) However, the Spurling's test[1] result was negative. Dr. Pasia told Shaw that he may benefit from a cervical discectomy and fusion and that surgery "would allow him to increase his current level of activity including job functions and would decrease his pain medication intake." (R. 14-2, PageID 140.) Dr. Pasia also informed Shaw of the risks of surgery, including "bleeding, infection, decreased or loss of motion, malunion, nonunion, need for further surgery, nerve damage, dural tear, paralysis, heart attack, and/or potential death." (R. 14-1, PageID 137.)

Shaw was evaluated further by Dr. Devon Hoover, a neurologist. On May 28, 2010, Dr. Hoover found that Shaw had "neuroforaminal narrowing at C5-6 and C6-7." (R. 14-4, PageID 325.) Dr. Hoover opined, "[t]hough the symptoms seem a bit pronounced for the MRI findings, I do believe the MRI likely explains the pain. . . . I do feel that he would be a candidate for a C5-6 and C6-7 anterior cervical discectomy and fusion. . . . At this point, he wants to do physical therapy and we will see him back in a couple of months to reassess." (*Id.*)

While receiving STD benefits, Shaw was also treated by Dr. Pasia's colleague, Dr. Matthew Sciotti. On June 30, 2010, Dr. Sciotti examined Shaw. His physical examination revealed "reduced range of motion" and "slight pain to palpation over the cervical paraspinal

---

[1]Physicians conduct a Spurling's test to assess nerve root compression and cervical radiculopathy by turning the patient's head and applying downward pressure. A positive Spurling's sign indicates that the neck pain radiates to the area of the body connected to the affected nerve. *Spurling's Test*, Physiopedia.com, http://www.physio-pedia.com/Spurling's_Test (last visited July 12, 2015).

muscles." (*Id.* at 353.)  The "Spurlings [were] negative bilaterally." (*Id.*)  Dr. Sciotti also performed an electromyography ("EMG"), with a nerve conduction study to test the electrical activity of Shaw's muscles.  The EMG revealed "few spontaneous waveforms in the right triceps and cervical paraspinal muscles." (*Id.* at 352.)  Dr. Sciotti referred Shaw to the Matrix Pain Management Clinic.

In June and July of 2010, Shaw saw a physical therapist, Dr. Sandy Payne.  Shaw reported he was "having less pain [and] more freedom of [movement] after treatment." (R. 14-3, PageID 237.)  However, he demonstrated "a very low tolerance for light exercise and minimal head movement with . . . increased pain." (*Id.*)  He also did not "demonstrate the tolerance for progression of manual techniques or exercise due to reported pain." (*Id.* at 241.)  Shaw had significant range-of-motion limitations, such as a cervical flexion of two degrees, an extension of 10 degrees, and a lateral flexion of 10 degrees. (*Id.* at 234.)  Additionally, Dr. Payne reported that Shaw had significant functional limitations, such as an inability to stand for more than 30 minutes, walk for more than 10 minutes, and lift more than 10 pounds with his left hand. (*Id.* at 235.)

In July 2010, Shaw also visited the Matrix Pain Management Clinic and was evaluated by Dr. Diane Czuk-Smith, an anesthesiologist.  Shaw reported "[t]he pain interfere[d] with his daily activities always" and "[h]is sleeping pattern [was] poor, sleeping about 3 hours maximum, waking up with the pain." (R. 14-7, PageID 491.)  Further, a physical examination showed "spinous process tenderness C2 through 7 and T4 through 6," "left facet tenderness C3 through T5 and right C3 through 7," and "suprascapular and upper trapezius muscle spasm." (*Id.* at 493.)  Shaw's range of motion from the neck was "positive at approximately 10 degrees flexion and extension." (*Id.*)  Shaw exhibited "extremely limited" head turning causing "significant pain." (*Id.*)

## C.  Shaw's Application for LTD Benefits

On April 22, 2010, Sedgwick sent Shaw a letter informing him that his STD benefits would expire on August 7, 2010, and that he might be eligible for LTD benefits.  In order to determine Shaw's eligibility, the letter instructed Shaw to complete the LTD application packet.  The packet required, among other things, Shaw to provide new authorizations for the release of

medical records and "[p]roof that [he had] applied for Social Security Disability benefits." (R. 14-1, PageID 112.)

On May 14, 2010, a Sedgwick claims representative called Shaw to discuss the LTD application packet. The representative explained the LTD application process and obtained information about Shaw's condition. On June 15, 2010, Shaw submitted his application.

On July 27, 2010, Sedgwick sent Shaw's application for LTD benefits to Dr. Xico Roberto Garcia, a family-practice physician. After reviewing the information, Dr. Garcia concluded that the "[m]edical information provided [did] not support incapacity from a sedentary job occupation." (R. 14-1, PageID 84.) Dr. Garcia noted that although Shaw's "[t]reating provider state[d] today that the employee ha[d] persistent neck pain, right upper extremity radiculopathy, limited neck range of motion, and inability to drive[,] . . . [t]here [were] no recent objective range of motion measurements provided . . . [and] no recent findings to support functional impairment." (*Id.* at 83.) However, Dr. Garcia acknowledged that he received range-of-motion measurements on July 6, 2010.

As part of Shaw's application, on July 30, 2010, Srilakshmi Sennerikuppam, a job-accommodation specialist, performed a "transferrable skills assessment" that took into consideration Shaw's "restrictions and limitations." Sennerikuppam stated that a case manager had asked that it be assumed that "Shaw can perform sedentary work." (R. 14-3, PageID 251.) According to Sennerikuppam, sedentary work "involves sitting most of the time, but may involve walking or standing for brief periods of time." (*Id.*) Given his experience and education, Sennerikuppam identified three sedentary occupations Shaw could perform: information clerk, telephone solicitor, and customer service representative. (*Id.* at 252.)

### D. Shaw's Denial of LTD Benefits

On August 18, 2010, Sedgwick sent a letter to Shaw informing him that he did not qualify for LTD benefits based on a review of Dr. Reincke's and Dr. Payne's medical documentation. Shaw was told that "[c]linical information does not document a severity of your condition(s) that supports your inability to perform any occupation." (*Id.* at 267.) Sedgwick

found that although Shaw's condition "may warrant ongoing treatment, the information reviewed does not provide clinical evidence of total disability from August 8, 2010." (*Id.*)

Sedgwick concluded that Shaw's doctors' notes did "not provide specific objective physical examination findings to indicate functional impairment." (*Id.*) Specifically, Sedgwick found "no specific measurements of range of motion," "no new neurological testing and motor strength testing," or "recent imaging studies or any other type of studies or findings to indicate functional impair[ment] from [his] sedentary job duties or any other type of job duties." (*Id.*) Sedgwick informed Shaw that the job specialist identified three alternative occupations that he was qualified to perform based on his training, education, and experience. The denial letter from Sedgwick included an outline of the appeals procedure. The letter stated that Shaw or his provider had to submit "[a] clear outline of your level of functionality" and "[f]indings from physical examinations." (*Id.* at 272.)

### E. Shaw's Appeal of the Denial of LTD Benefits

On February 15, 2011, Shaw appealed the denial of his LTD benefits claim. Along with his appeal form, Shaw attached numerous exhibits documenting his condition, including the Michigan Disability Parking Placard signed and certified by Dr. Reincke, the Matrix Pain Management Clinic report, Dr. Reincke's residual-functional-capacity questionnaire, and the medical records of Drs. Sciotti, Pasia, and Hoover.

The functional-capacity questionnaire, provided by the Social Security Administration ("SSA") to assess Shaw's ability to work, was completed by Dr. Reincke on February 9, 2011. Dr. Reincke's assessment showed that Shaw had persistent neck pain aggravated by prolonged sitting and standing. Dr. Reincke indicated that Shaw "[c]onstantly" had "pain or other symptoms severe enough to interfere with **attention and concentration** needed to perform even simple work tasks." (R. 14-3, PageID 304 (emphasis in original).) Dr. Reincke noted that Shaw could sit or stand only for 30 minutes at a time and would need to lie down for an hour at a time to recuperate. In a typical eight-hour workday, Dr. Reincke said Shaw could stand or walk for less than two hours. Overall, Dr. Reincke said Shaw has "good days" and "bad days." (*Id.* at 306.)

In addition to submitting these materials, Shaw requested an additional 30 days to submit further medical documentation. On February 21, 2011, Sedgwick sent Shaw a letter granting his request. On March 17, 2011, Shaw submitted additional medical documentation, including the entire examination report from the Matrix Pain Mangement Clinic, further records from Dr. Reincke, and records from Mercy Hospital.

On March 21, 2011, Shaw also submitted an Employability Assessment by Jen Kaiser or Jennifer Turecki. The report states that Shaw's "prognosis is poor. . . . [and he] experiences headaches with the pain level of 7 to 10 . . . 3 to 4 times per week, lasting 4 to 24 hours each occurrence." (R. 14-10, PageID 604.) The report concludes that Shaw cannot engage in "competitive employment" because "[t]here is no competitive employment that allows an individual to lie down" or "allow[s] for missing more than 2 days per month." (*Id.*)

Sedgwick forwarded Shaw's file to two independent physician advisors to perform a medical review: Dr. Imad Shahhal and Dr. Jamie Lee Lewis. On March 23, 2011, Dr. Shahhal, a neurosurgeon, called and left messages with Drs. Reinke and Hoover, requesting that they call back within 24 hours; otherwise, he would complete the report "based on available medical information." (R. 14-10, PageID 614–15.) Drs. Reinke and Hoover did not call back in the time provided and Dr. Shahhal completed the report on March 28, 2011. After reviewing Shaw's medical documentation, Dr. Shahhal concluded that Shaw was "not disabled from any occupation." (*Id.* at 616.) As the rationale for this conclusion, Dr. Shahhal stated that "[a]lthough the patient does have evidence of cervical disc disease and radiculopathy over a prolonged period of time, the most recent examination of 9/03/10 showed a positive Spurling test on the right with normal strength, sensation, and reflexes." (*Id.*)

On March 23, 2011, Dr. Lewis, a specialist in physical medicine and rehabilitation and pain medicine, also called and left messages with Drs. Reincke, Smith, Payne, and Pasia, requesting that they call back within 24 hours; otherwise, he would complete the report "based on available medical information." (*Id.* at 619–20.) They did not call back in the time specified and Dr. Lewis completed the report on March 28, 2011. After reviewing Shaw's medical documentation, Dr. Lewis concluded that Shaw was "not disabled from any occupation." (*Id.* at 621.) Dr. Lewis found that because Shaw decided against surgery, "medical documentation

would suggest noncompliance with medical care." (*Id.* at 622.) Dr. Lewis further concluded that "[t]he above findings would not support a musculoskeletal condition that would preclude performance of sedentary work, nor is there evidence that performance of sedentary work would result in objectively measurable exacerbation of an underlying physical condition that would be expected to further exacerbate underlying pain level." (*Id.*)

While Sedgwick's physician advisers conducted their review, on April 22, 2011, the SSA granted Shaw a "fully favorable decision." (14-11, PageID 662.) The SSA found Shaw "disabled from July 31, 2009" as a result of "cervical herniation at C6-7 with radiculopathy, and degenerative disc disease at C5-6." (*Id.* at 668, 670.) It further found that Shaw's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that [Shaw's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] generally credible." (*Id.* at 671.)

On April 28, 2011, Sedgwick sent Shaw a letter informing him that his claim for LTD benefits had been denied. Sedgwick found that Shaw did not provide "objective medical documentation" showing that he cannot engage in "any occupation or employment . . . for which [he] is qualified." (*Id.* at 674.) Sedgwick stated that the QRU and two independent physician advisors reviewed all of the information supporting his claim, which included, among other things, documentation from Drs. Reincke, Pasia, Sciotti, Czuk-Smith, and Hoover. The letter also noted the transferable-skills analysis that identified three alternative occupations Shaw was qualified to perform based on his "training, education and experience." (*Id.* at 675.) Accordingly, Sedgwick upheld the denial of Shaw's LTD benefits.

## F. Procedural History

On March 31, 2013, Shaw filed a complaint against the Plan in the United States District Court for the Eastern District of Michigan, alleging that he was wrongly denied LTD benefits owed under the terms of the Plan. On February 28, 2014, the parties filed cross-motions for judgment on the administrative record. On September 8, 2014, the district court granted the Plan's motion and entered judgment dismissing Shaw's case with prejudice. Shaw now appeals the district court's judgment.

## IV.  ANALYSIS

### A.  Standard of Review

Under Section 502 of ERISA, a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan grants the plan administrator such discretion, then a court must review the administrator's denial of benefits under the arbitrary-and-capricious standard.  *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir. 2003).

Under either de novo review or arbitrary-and-capricious review, generally a court may consider only the evidence available to the administrator at the time the final decision was made. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014).  On appeal, we review de novo the district court's finding that the administrator's denial was not arbitrary and capricious. *Id.*

Shaw argues that de novo review applies here because there is insufficient evidence showing that the Plan gave Sedgwick discretionary authority.  However, the controlling agreement, the AT&T Midwest Disability Benefits Program, explicitly states that "[t]he Plan Administrator (or, in matters delegated to third parties, the third party that has been so delegated) will have sole discretion to interpret [the disability plan], including . . . determinations of coverage and eligibility for benefits." (R. 15-5, PageID 1156.)  The plan administrator delegated to the claims administrator the authority "to determine whether a particular Eligible Employee who has filed a claim for benefits is entitled to benefits" and delegated to the appeals administrator the authority to "determine whether a claim was properly decided by the Claims Administrator." (*Id.*)

The contact-information section in the Plan identifies the IDSC as the claims administrator and the QRU as the appeals administrator. The IDSC and the QRU are both divisions within Sedgwick. Therefore, Sedgwick has "sole discretion to interpret the Program, including, but not limited to, interpretation of the terms of the Program, determinations of coverage and eligibility for benefits, and determination of all relevant factual matters." (*Id.*) Thus, the arbitrary-and-capricious standard applies.

**B. Merits**

Under the arbitrary-and-capricious standard, we must uphold the plan administrator's decision if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009) (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks omitted). However, arbitrary-and-capricious review is not a "rubber stamp." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009). "Several lodestars guide our decision: 'the quality and quantity of the medical evidence'; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552–53 (6th Cir. 2008)).

After reviewing the record, we conclude that the Plan acted arbitrarily and capriciously in denying Shaw LTD benefits. Although the Plan determined that there was not objective medical documentation of Shaw's inability to perform any occupation, it ignored favorable evidence submitted by his treating physicians, selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating physicians.

### *1. Ignoring Favorable Evidence from Shaw's Treating Physicians*

"[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). However, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

Here, the Plan completely ignored favorable evidence from Shaw's treating physicians. In rejecting Shaw's claim for LTD benefits, the Plan stated there were "no specific measurements of range of motion. There was no specific physical examination to indicate functional impairment. There were no new neurological testing and motor strength testing." (R. 14-3, PageID 267.) However, Shaw's medical records provide just such information. Dr. Payne's physical-therapy records show that Shaw had significant range-of-motion limitations, such as a cervical flexion of two degrees, an extension of 10 degrees, and a lateral flexion of 10 degrees. Additionally, Dr. Payne's records show that Shaw had significant functional limitations, such as an inability to stand for more than 30 minutes, walk for more than 10 minutes, and lift more than 10 pounds with his left hand. Moreover, Shaw's Matrix Pain Management Clinic records provide specific range-of-motion limitations and the detailed results of a physical examination.

According to these records, "Range of motion of the neck is positive at approximately 10 degrees flexion and extension. Head turning is extremely limited and eliciting significant pain." (R. 14-7, PageID 493.) The fact that the Plan made the "factually incorrect assertion[]" that Shaw had not submitted specific measurements of range of motion supports a finding that the Plan acted arbitrarily and capriciously. *See Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 568 (6th Cir. 2014) (finding that the plan acted arbitrarily and capriciously in part because it "ignored key pieces of evidence" and made "factually incorrect assertions").

The Plan also ignored Dr. Reincke's residual-functional-capacity questionnaire submitted as part of Shaw's appeal of the denial of LTD benefits. The questionnaire stated that Shaw "[c]onstantly" had "pain or other symptoms severe enough to interfere with **attention and concentration** needed to perform even simple work tasks." (R. 14-3, PageID 304 (emphasis in original).) More significantly, Dr. Reincke indicated on the questionnaire that Shaw could sit

and stand for only 30 minutes at a time and had to lie down for an hour to recuperate afterwards. A functional capacity evaluation "is generally a reliable and objective method of gauging the extent one can complete work-related tasks." *Caesar v. Hartford Life & Accident Ins. Co.*, 464 F. App'x 431, 435 (6th Cir. 2012) (internal quotation marks omitted); *see also Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. 2006) (describing a functional-capacity evaluation as "objective evidence" of the claimant's back pain).  Further, these conclusions in Dr. Reincke's residual-functional-capacity questionnaire are supported by her earlier medical records, which noted that Shaw could "only sit for 20 minutes" (R. 14-3, PageID 262), as well as the physical therapy records from Dr. Payne, which stated that Shaw could stand for only 30 minutes and walk for only 10 minutes (*Id.* at 235).

Instead of offering evidence to contradict Dr. Reincke's residual-functional-capacity questionnaire's conclusions, the Plan's physician advisors simply ignored the questionnaire and concluded that Shaw could perform sedentary work.  "[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006); *see also Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 608–09 (6th Cir. 2014) (finding that the plan acted arbitrarily and capriciously in denying benefits for a mental disorder in part because the plan failed to "'give reasons' for rejecting a treating physician's conclusions").

Finally, the Plan ignored favorable evidence from Shaw's treating physicians by failing to make a reasonable effort to speak with them.  Although the Plan's physician advisors attempted to contact each of Shaw's treating physicians, they gave the treating physicians only 24 hours to respond to their requests before they made their disability decisions "based on available medical information."  None of the physicians was able to meet this unreasonable deadline.  Physicians, like other professionals, are busy and cannot always return calls immediately.  Thus, "although persons conducting a file review are not per se required to interview the treating physician," *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009), the cursory manner in which the Plan attempted to contact Shaw's treating physicians is evidence that the Plan's decision was not "the result of a deliberate, principled

reasoning process." *DeLisle*, 558 F.3d at 444; *see Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 168 (6th Cir. 2007) ("We find that [the doctor's] haste to complete his report in disregard of his explicit instructions to interview [the claimant's] treating physicians was unreasonable, especially because he allowed so little time before he 'pulled the trigger.'").

## 2. Selectively Reviewing Treating Physician Evidence

An administrator acts arbitrarily and capriciously when it "engages in a selective review of the administrative record to justify a decision to terminate coverage." *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotation marks omitted). Dr. Garcia engaged in selective review when he concluded on July 29, 2010, that Shaw was not disabled because "[t]here [were] no recent objective range of motion measurements provided." (R. 14-1, PageID 83.) But in the very next sentence, Dr. Garcia specifically notes that he received range of motion measurements on July 6, 2010. Dr. Garcia fails to explain why these measurements were not satisfactory.

Dr. Shahhal engaged in a selective review when he concluded that Shaw was not disabled because his "exam on 09/03/10 showed a positive Spurling test on the right, with normal strength, sensation, and reflexes." (R. 14-10, PageID 616.) First, a "positive Spurling test" indicates that the patient has neck pain radiating to the area of the body connected to the affected nerve; if anything, a positive Spurling's test is evidence of a disability. Second, although Shaw may have had "normal strength, sensation, and reflexes" in his arms, Shaw's disability stemmed from pain in his neck. In the same examination on September 3, 2010, Dr. Hoover stated that Shaw "continues to have pain in his neck and radiating in the right arm to the hand." (R. 14-4, PageID 323.)

Dr. Lewis also engaged in a selective review of the record when he suggested that Shaw was noncompliant with medical advice because Shaw did not have surgery. Drs. Pasia and Hoover recommended "C5-6 and C6-7 cervical discectomy and fusion" to "increase his current level of activity including job functions . . . [and] decrease his pain medication intake." (R. 14-4, PageID 325; R. 14-2, PageID 140.) However, both doctors also informed Shaw of the risks of surgery and identified physical therapy as an alternative and a more conservative treatment option. Shaw chose to undergo physical therapy in June and July of 2010. There is nothing in

the Plan that requires Shaw to pursue the more aggressive treatment recommended by doctors in order to be eligible for LTD benefits. Therefore, Dr. Lewis's conclusion that Shaw was noncompliant with medical advice constitutes a selective review of the record.

### 3. Failing to Conduct Its Own Physical Evaluation

"[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005). However, we have held that the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Helfman*, 573 F.3d at 393 (quoting *Calvert*, 409 F.3d at 295).

Here, the Plan specifically reserved the right to conduct its own "examination by a Physician chosen by the Claims Administrator, if the Claims Administrator determines that such an examination is necessary." (R. 15-5, PageID 1134, 1146.) However, the Plan's physician advisors failed even to attempt to conduct their own in-person evaluation of Shaw. This is especially troubling because the Plan's physician advisors "second-guess[ed] [Shaw's] treating physicians" and made "credibility determinations." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).

The Plan second-guessed Shaw's treating physicians when it credited the assumption of the transferrable-skills analysis that "Mr. Shaw can perform sedentary work" over Dr. Reincke's conclusion that Shaw could not sit for more than 30 minutes at a time. In the letter denying Shaw's LTD benefits, the Plan relies in part on the transferrable-skills analysis as a reason for its decision to deny him benefits. However, the entire issue before the Plan was whether Shaw could perform sedentary work and Shaw's treating physician, Dr. Reincke, concluded that he could not sit for more than 30 minutes at a time. Given that a sedentary job is defined as "sitting most of the time," the Plan should have explained why it credited the flawed assumption of the transferrable-skills analysis over Dr. Reincke's findings.

The Plan made a credibility determination when it discounted Dr. Reincke's medical records because they were "based *solely* on Shaw's own subjective complaints of pain."

(Appellee's Br. at 22.) However, without ever examining Shaw, the Plan should not have made a credibility determination about Shaw's continuous reports of pain. *See Fura*, 534 F. App'x at 343 ("[The doctor] never examined [the claimant], so he had no first-hand knowledge of [the claimant's] pain."); *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263–64 (6th Cir. 2006) (holding that it was improper to rely on non-examining medical consultant to determine severity and credibility of pain). As the Eleventh Circuit observed, "[t]here is, quite simply, no laboratory [ ] test to diagnose chronic pain syndrome. . . . Chronic pain syndrome is a severely debilitating medical condition that may be fully diagnosed only through long-term clinical observation." *Lee v. BellSouth Telecomms., Inc.*, 318 F. App'x 829, 837 (11th Cir. 2009). Because chronic pain is not easily subject to objective verification, the Plan's decision to conduct only a file review supports a finding that the decision-making was arbitrary and capricious.

### 4. Heavily Relying on Physician Consultants

"The Supreme Court has acknowledged 'that physicians repeatedly retained by benefits plans may have an incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements.'" *Elliott*, 473 F.3d at 620 (quoting *Nord*, 538 U.S. at 832); *see also Butler*, 764 F.3d at 569 ("That reviewing physicians paid by or contracted with the insurer agree with its decision, though, does not prove that the insurer reached a reasoned decision supported by substantial evidence.").

Dr. Lewis's conclusions have been questioned in numerous federal cases, in all of which he was hired by Sedgwick. *See, e.g.*, *Holzmeyer v. Walgreen Income Prot. Plan for Pharmacists & Registered Nurses*, 44 F. Supp. 3d 821, 837 (S.D. Ind. 2014) ("The record review opinions of Drs. Parisien and Lewis—upon which Sedgwick's letter of termination principally relied—either ignored or misconstrued the functional capacity evaluations proffered by [claimant's] treating physicians."); *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 865–66, 883 (N.D. Cal. 2014) (finding that Dr. Lewis's review ignored or misstated evidence by treating physicians); *May v. AT & T Integrated Disability*, 948 F. Supp. 2d 1302, 1308 (N.D. Ala. 2013) (finding that Sedgwick, including Dr. Lewis, "demonstrated more loyalty to the funding entity which had employed it, than to its *cestui que trust* during the administrative process"), *aff'd*, 579 F. App'x 690 (11th Cir. 2014); *Dudley v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 3:11-CV-

0028-G, 2011 WL 5080739, at *7 (N.D. Tex. Oct. 24, 2011) (finding for defendant but noting that Dr. Lewis's opinion was in direct conflict with the opinions of claimant's treating physicians), *aff'd*, 495 F. App'x 470 (5th Cir. 2012). Therefore, Dr. Lewis's track record further supports the conclusion that the Plan did not engage in a "deliberate, principled reasoning process" in this case. *Glenn*, 461 F.3d at 666.

Based on the above review of Sedgwick's decision-making process, we find that Sedgwick's denial of Shaw's LTD benefits was arbitrary and capricious. "While none of the factors alone is dispositive, we find that as a whole, they support a finding that [Sedgwick] did not engage in a deliberate and principled reasoning process." *Helfman*, 573 F.3d at 396. Any other finding in the face of such flagrant errors would essentially turn judicial review of these matters into a "rubber stamp." *Cox*, 585 F.3d at 302.

**C. Remedy**

When a benefits plan is found to have acted arbitrarily and capriciously, we have two options: award benefits to the claimant or remand to the plan administrator. Our court has adopted the rule that "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (internal quotation marks and brackets omitted).

Remand here would be a useless formality. Although the plan's decision-making process was unquestionably flawed, it is also clear that Shaw was denied benefits to which he is entitled. *See Cooper*, 486 F.3d at 171 (finding, in similar chronic-pain case, no need to remand the matter to the administrator because objective medical evidence showed that the plaintiff was clearly entitled to benefits); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 513 (6th Cir. 2005) (concluding that the appropriate remedy was an immediate award of benefits).

Shaw's medical records contain objective medical evidence that he is disabled. Dr. Reincke's medical records and functional capacity evaluation show that Shaw is unable to sit or stand for more than 30 minutes and has to lie down for an hour or more to recuperate. As stated

earlier, a functional-capacity evaluation is "objective evidence" of a claimant's disability. *Brooking*, 167 F. App'x at 549; *see also Caesar*, 464 F. App'x at 435.

Further, Shaw's MRI revealed a herniated nucleus pulposus at C6/7 causing right foraminal stenosis and a right paracentral disc bulge with effacement of the thecal sac. A physical examination by Dr. Pasia revealed "some paravertebral spasm at the back of the neck" and "limited range of motion with flexion, extension, rotation, and bending secondary to pain." Shaw's medical records contain positive and negative Spurling's tests. (R. 14-1, PageID 90; R. 14-4, PageID 346; R. 14-10, PageID 616.) But Dr. Reincke has explained that Shaw's condition is subject to variability. An EMG revealed "few spontaneous waveforms in the right triceps and cervical paraspinal muscles." (R. 14-4, PageID 352.) Finally, there are specific measurements demonstrating range-of-motion limitations. In similar cases where there has been objective medical evidence that a claimant is disabled, we have awarded benefits without remanding. *See, e.g., Cooper*, 486 F.3d at 171 (awarding benefits due to objective medical evidence showing claimant was disabled); *Kalish*, 419 F.3d at 513 (same); *Caesar*, 464 F. App'x at 436 (same); *Brooking*, 167 F. App'x at 550 (same). Given the substantial and objective medical evidence demonstrating that Shaw is disabled, Shaw is entitled to LTD benefits.

## V. CONCLUSION

For the foregoing reasons, we conclude that the Plan acted arbitrarily and capriciously in denying Shaw LTD benefits, and remand this case to the district court to enter an order awarding Shaw LTD benefits.

———————————

**DISSENT**

———————————

KETHLEDGE, Circuit Judge, dissenting.   To qualify for long-term disability benefits under AT&T's Plan, Raymond Shaw needed to show by "objective Medical Documentation" that he would not be able to "engag[e] in any occupation or employment . . . for which [he is] qualified or may reasonably become qualified[.]"   The Plan administrator found that Shaw was able to engage in sedentary work, and so denied his claim.   Our review of that decision is deferential:  we ask only whether the Plan's decision was arbitrary or capricious.   *See Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998).

The Plan's decision was neither of those things.   Shaw failed to show, with "objective medical documentation," that his condition was so severe as to prevent him from working in any occupation.   True, Shaw's family-practice doctor did once suggest—in a handwritten note supported by scant medical analysis—that Shaw would need to take 60-minute breaks every 30 minutes.   But three specialists who reviewed Shaw's medical file each opined that he could nevertheless perform sedentary work.   The Plan's reliance on those opinions was not arbitrary and capricious.   I respectfully dissent.