NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0155n.06

No. 17-3400

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 26, 2018
DEBORAH S. HUNT, Clerk

|  |  |
|---|---|
| KATHERINE CASTOR, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| AT&T UMBRELLA BENEFIT PLAN NO. 3, | ) |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

Before: MOORE, THAPAR, and LARSEN, Circuit Judges.

**LARSEN, Circuit Judge.** Plaintiff Katherine Castor challenges the decision of her disability insurer, AT&T Umbrella Benefit Plan No. 3 ("AT&T"), to deny her claim for disability benefits. The district court granted judgment on the administrative record to AT&T. We AFFIRM.

I.

Castor was employed by the Ohio Bell Telephone Company, where she worked as a customer service representative for approximately fifteen years. As an employee, Castor was eligible to receive short-term and long-term disability coverage under the AT&T Midwest Disability Program, a component of a larger plan sponsored by AT&T known as AT&T Umbrella Benefit Plan No. 3, the defendant in this case. The Plan gave discretion to Sedgwick

Claims Management Services, Inc. ("Sedgwick"), as claims administrator, to decide whether an employee had a qualifying disability under the Plan.

In early 2014, Castor was diagnosed with clostridium difficile, an infection that caused abdominal discomfort and intestinal problems. On February 12, 2014, she filed a claim for short-term disability benefits, which Sedgwick approved. Shortly thereafter, having recovered from clostridium difficile, Castor was hospitalized for unrelated illnesses—pneumonia and H1N1. She was hospitalized again in May 2014 for atrial fibrillation and congestive heart failure. Doctors determined that Castor had a left ventricle ejection fraction of 25%.[1] She underwent successful left ventricular ablation surgery in September 2014. Throughout these ailments and hospitalizations, Castor continuously received short-term disability benefits.

On November 21, 2014, Sedgwick informed Castor that her eligibility for short-term disability benefits would expire on February 10, 2015 (the end of the maximum fifty-two week period provided for in the Plan), but that she might thereafter be eligible for long-term disability benefits.[2] Castor then applied for long-term disability benefits.

Around that time, Dr. Amit Goyal, Castor's cardiologist, reviewed her test results, which showed that Castor's ejection fraction had improved to 40% since her surgery. Dr. Goyal indicated that Castor should be able to return to work on February 2, 2015. Upon receiving Dr. Goyal's notes, Sedgwick ordered an independent file review.

Dr. Chester Conrad, a physician board-certified in internal medicine and cardiovascular disease, undertook the review. In his report, Dr. Conrad characterized Castor's job duties as

---

[1] The district court explained, "Although not relevant to the Court's determination, the Court notes that, according to the Cleveland Clinic website, normal left ventricle ejection fraction ranges from 55-70%. An ejection fraction of 40-54% is 'slightly below normal,' and a person with an ejection fraction in this range 'may not have symptoms.'"

[2] To be eligible for long-term disability benefits under the Plan, an employee must have first "received the maximum amount (52 weeks)" of short-term disability benefits.

"sedentary, with physical requirements including sitting, typing, and talking." Dr. Conrad concluded that Castor's medical records revealed no disability that would prevent her from performing her work as of December 11, 2014, finding that "[t]he available information does not establish a functional impairment or need for restrictions that would preclude sedentary work or require additional restrictions from 12/11/14 forward from a cardiology perspective." Dr. Conrad's report also included a statement from Dr. Goyal, made to another doctor in Dr. Conrad's practice on December 16, 2014, conveying Dr. Goyal's belief that Castor was "capable of full-time full duty sedentary work." In light of this report, Sedgwick sent a letter to Castor informing her that short-term disability benefits had been terminated as of December 11, 2014. The letter informed Castor that she could submit additional documentation to support her claim of disability and that she had a right to appeal the decision.

In response, Castor submitted additional medical records from recent office visits and further discussed her disability claim with Sedgwick, but Sedgwick adhered to its original decision to terminate her short-term disability benefits as of December 11, 2014. Sedgwick then denied Castor's claim for long-term disability benefits because she had not received the prerequisite fifty-two weeks of short-term disability benefits as set forth in the Plan.

Castor indicated her intent to appeal the denial of short-term and long-term disability benefits on February 12, 2015, and followed up with a letter of appeal on June 18, 2015. But in her appeal letter, rather than contest Sedgwick's determination that she was no longer physically disabled as of December 11, 2014, Castor claimed that anxiety and depression had rendered her unable to perform her job duties from December 11, 2014, through February 10, 2015.[3] In

---

[3] In the eight-page appeal letter, drafted by counsel, Castor's only mention of physical disability appeared in a limited portion of the background section, chronicling her disability claims up until the time of the appeal. The remainder of the letter focused on mental-health issues. In the

support of her appeal, Castor offered the opinions of three individuals—Dr. John Murphy, her primary care physician; Cynthia Shaw, a licensed clinical counselor; and Dr. Jack Lunderman, a psychiatrist.

Dr. Murphy, whom Castor had been seeing since 2014, stated in an opinion letter that, "in mid-2014, Mrs. Castor began experiencing severe symptoms of anxiety and depression" and expressed his belief "that Mrs. Castor has been experiencing anxiety and depression for some time but was attempting to work through these problems herself." He stated that this anxiety would have precluded her from performing her work as a customer service representative and from returning to work in the future in any occupation. Shaw, whom Castor had first visited in February 2015, also diagnosed Castor with anxiety disorder and depression. If Castor returned to work, Shaw believed she would "make more mistakes and then it would be a vicious cycle, the more mistakes she made, the more anxious she would get." Shaw admitted that she could not speak to Castor's symptoms before February 2, 2015, but, relying on Castor's explanation of those symptoms, she surmised that the anxiety had manifested itself before December 2014 and would have prevented Castor from performing her job duties from December 2014 to February 2015. Dr. Lunderman, whom Castor visited four times from March through May 2015, explained that Castor had "consistently shown signs of severe depression, and inability to handle stress" and that "[h]er symptoms would affect her ability to work on a sustained basis more than one-third of the work day. Her inability to maintain attention and concentration as well as slowed speech would hinder her ability to deal directly with the public and/or co-workers."

---

conclusion, Castor asked that her benefits be reinstated because of anxiety and depression; she made no mention of her previous physical ailments and did not attempt to challenge Sedgwick's conclusion that she was physically able to return to work as of December 11, 2014.

After receiving Castor's appeal package, Sedgwick ordered file reviews to determine whether a disability rendered Castor unable to perform her job duties as of December 11, 2014. Although Castor's appeal letter discussed only mental-health concerns, Sedgwick sought the review of Dr. Jose Perez, Jr., an internist, who concluded that Castor was physically able to perform her job as of December 11, 2014. Sedgwick also consulted Dr. Michael Rater, a psychiatrist, who concluded that mental-health issues did not prevent Castor from performing her job as of December 11, 2014. Finally, Sedgwick asked Dr. Conrad to review Castor's updated file; he again concluded that Castor was not physically disabled from her regular job as of December 11, 2014.

On the basis of these reports, Sedgwick notified Castor that it was upholding the termination of her disability benefits. The denial letter summarized the findings of the reviewing physicians and stated: "Although some findings [of disability] are referenced, none are documented to be so severe as to prevent your client from performing the job duties of Service Representative with or without reasonable accommodation from December 11, 2014 through present." The letter informed Castor that no further administrative review was available. Castor did not return to work, and she was terminated.

On September 21, 2015, Castor filed suit against AT&T, seeking review of the decisions to terminate her short-term disability benefits and deny her long-term disability benefits under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. The parties filed cross-motions for judgment on the administrative record. In an opinion dated March 20, 2017, the district court upheld Sedgwick's decision to terminate Castor's disability benefits. Castor appealed to this Court.

II.

A.

Castor first argues that Sedgwick deprived her of a "full and fair review" of its decision to terminate her disability benefits, as required by 29 U.S.C § 1133, by consulting Dr. Conrad for both the initial benefits-denial determination and on appeal. We review de novo the legal question whether Sedgwick complied with the requirements of § 1133. *See McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005).

The requirements of a full and fair review are set forth in regulations. 29 C.F.R. § 2560.503-1. One such requirement is that the plan administrator on appeal consult "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," § 2560.503-1(h)(3)(iii), who "is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." § 2560.503-1(h)(3)(v). These requirements apply to plans providing disability benefits. *See* § 2560.503-1(h)(4).

Sedgwick's actions on appeal did not violate § 2560.503-1(h)(3). Sedgwick terminated Castor's short-term disability benefits as of December 11, 2014, based on the opinions of her own cardiologist, Dr. Goyal, and a reviewing cardiologist, Dr. Conrad, that Castor was no longer physically disabled and could return to work. Castor appealed the decision, and during that appeals process, Sedgwick invited Dr. Conrad to review Castor's updated file to determine whether his prior opinion had changed. This, Castor claims, violated the regulation's prohibition on consulting the same doctor twice.

But Castor's appeal shifted her focus: while she had previously alleged physical disability, her appeal complained only of psychiatric disability caused by anxiety and

depression.[4]  AT&T argues that Castor thereby abandoned her claim of physical disability, and so Dr. Conrad's second evaluation of that claim could not matter.  We need not decide whether this change of focus constituted abandonment of the physical-disability claim on appeal, because even if the physical disability remained at issue, Sedgwick complied with § 2560.503-1(h)(3).

Sedgwick responded to Castor's appeal by asking two new doctors—Dr. Rater, a psychiatrist, and Dr. Perez, an internist—to review, respectively, Castor's claims of psychiatric and physical disability.[5]  Having engaged one pair of "fresh eyes" to review each of her claims,

---

[4] Before this Court, Castor contends, in cursory fashion, that her appeal letter did, in fact, challenge Sedgwick's initial determination regarding her physical fitness for work.  As noted previously, *supra* note 3, Castor's appeal letter focused on a psychiatric disability and never claimed that Castor remained physically disabled as of December 11, 2014.  Indeed, shortly after filing the letter of appeal, Castor's attorney acknowledged to Sedgwick that the focus had shifted to a psychiatric disability.  Sedgwick's notes from a phone call with Castor's attorney state: "Noted his ltr and the med and rev'd that it appears he is stating that primary disability condition is psychiatric. *He confirmed that as of now it is psychiatric*." (Emphasis added.)  Nonetheless, Sedgwick informed Castor's attorney that "we will be reviewing both types of conditions."

[5] Castor suggests briefly that Dr. Perez, as an internist, was unqualified to assess her claim of physical disability.  But Castor presented no such challenge in the district court.  Indeed, Castor's only attack on Dr. Perez's qualifications in that court related to his inability to judge her *psychiatric* disabilities, objecting that "Dr. Perez was incapable by professional limitation of evaluating claimant's anxiety and depression."  This was a curious challenge, as there is no suggestion in the record that Dr. Perez ever evaluated Castor's claims of psychiatric disability, only her physical ones.  Castor's failure to challenge Dr. Perez's fitness to review her claims of physical disability in the district court forfeits the claim for appeal.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).  Moreover, Castor's perfunctory presentation in this Court states only that we "should be reminded that cardiology is a unique medical speciality that could not be addressed by other physicians used by [defendant] to evaluate Mrs. Castor's appeal."  She cites as support only an unpublished opinion, *Loan v. Prudential Ins. Co. of Am.*, 370 F. App'x 592 (6th Cir. 2010), that dealt with the need for a toxicologist, not a cardiologist, in a circumstance in which the plaintiffs "raised a number of issues concerning the reliability of the toxicology report" at issue and in which defendant's own in-house doctor essentially conceded that a toxicologist was necessary. *Id.* at 598.  *Loan*, moreover, took pains "not to say that a plan administrator must always consult a specialist to provide a full and fair review of adverse benefits determinations." *Id.*  *Loan*, therefore, has no bearing on this case, except to advance the unremarkable proposition that whether a specialist is needed will depend upon the facts of the case.  Castor has done nothing, either in this Court or in the court below, to develop the argument that Dr. Perez in particular, or internists in general, lack the "appropriate training and

the regulations did not preclude Sedgwick from also consulting Dr. Conrad. Section 2560.503-1(a) sets forth the "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." The regulations do not speak to what *more* an administrator can do when reviewing an appeal once an appropriate consultation with a new doctor has been made. They neither affirmatively preclude an administrator from seeking additional reviews, nor preclude an administrator from asking the original doctor whether his opinion has changed in light of new medical evidence.

Indeed, it would be odd to suggest that a plan administrator, already armed with independent reviews from new doctors that had confirmed the initial benefit determination, could not circle back to the initial doctor to see whether, in light of any new information, his assessment had changed. This is especially true here, where there are no allegations that Dr. Conrad's subsequent report was seen by or in any way influenced Dr. Perez's independent review. Sedgwick therefore did not violate § 2560.503-1(h)(3) by consulting Dr. Conrad on appeal, in addition to Dr. Rater and Dr. Perez.[6]

### B.

Castor next raises two challenges to Sedgwick's decision to deny her disability benefits. "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 505–06 (6th Cir. 2005) (quoting

---

experience," § 2560.503-1(h)(3)(iii), to be able to evaluate her claim of physical disability. Her claim is therefore not preserved for appeal. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

[6] Because we find no violation of § 2560.503-1(h)(3), we need not address the proper remedy for such a violation.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Here, it is undisputed Sedgwick had discretionary authority as administrator. "When such authority is granted, the highly deferential arbitrary and capricious standard of review is appropriate." *Id.* at 506 (quoting *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)). An "administrator's decision will not be deemed arbitrary and capricious so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Id.* (quoting *Davis v. Ky. Fin. Co.'s. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). "The arbitrary or capricious standard is the least demanding form of judicial review." *Davis*, 887 F.2d at 693 (citation omitted).

i.

Castor argues that Sedgwick's decision to terminate her benefits was arbitrary and capricious because it relied on medical reviews that did not adequately consider and address her job duties. The Plan told employees they would be considered "disabled" if "sickness, pregnancy, or an off-the-job illness or injury [] prevents you from performing the duties of your job (or any other job assigned by the Company for which you are qualified) with or without reasonable accommodation." At the time Dr. Conrad conducted his initial December 2014 review of her claim for short-term disability benefits, Castor had complained only that she was physically disabled from performing her duties as a customer service representative. Dr. Conrad, although lacking access to Castor's full job description set forth below, characterized those duties as "sedentary, with physical requirements including sitting, typing, and talking." Castor claims that this summary was inadequate, as her "job description indicates that she was required to possess technical knowledge; . . . to work with the public; and her job had a sales feature which clearly involved elements of persuasion and compliance."

According to the job description contained in the claim file, Castor's job was to assist "customers with orders, billing, and/or collection related issues." The job description listed twenty core duties, which the district court summarized as follows:

> handling telephone customer contacts; determining customer requirements; accessing databases and inputting customer information on the computer while speaking to customers; negotiating and preparing service order requests; computing and quoting rates, adjustments and balances; meeting service and collection goals and deadlines; coordinating service arrangements with other departments; correcting billing and service errors; trouble-shooting; preparing letters; recommending and selling appropriate products and services; investigating and resolving billing inquiries; obtaining, assessing and establishing customer credit information; investigating customer complaints of annoyance calls; and aiding physically challenged customers in their need for telecommunications.

Even if, as Castor claims, there were sales skills listed in this job description that were not adequately captured in Dr. Conrad's shorthand description ("sit, talk, type"), that would not change the fact that Castor's job was sedentary in nature, and that the *physical* duties of the job could reasonably be summarized as sitting, talking, and typing. Dr. Conrad's shorthand, although perhaps inartful, adequately described the physical rigors of Castor's job for the purposes of determining whether she was physically disabled under the Plan.

Castor also faults the reviewing doctors' consideration of her job duties on appeal. Castor acknowledges that after she filed her appeal, and shifted her focus to whether she was mentally able to perform the duties of her job, the reviewing doctors had the complete description of her job duties. Yet she contends that, even with the benefit of the job description, the reviewing doctors' reports were devoid of any indication that they understood the skilled work that she did.[7]

---

[7] Castor cites *Kalish*, 419 F.3d at 509–10, for the proposition that a disability denial may not lawfully "under evaluate[] the actual duties performed by the claimant." We find no violation of

We see no error in the reports. It is evident from each report that the reviewing doctors read and understood Castor's formal job description. And because we find no error in Dr. Conrad's use of a shorthand description of the physical elements of her job in his initial report, it follows that we would find no error in Dr. Conrad's and Dr. Perez's reports respecting her claim of physical disability on appeal, which relied on Castor's actual job description. We are also unpersuaded that Dr. Rater needed to do more to show that he understood the skills set forth in the job description. Dr. Rater's report indicated that he understood that there was a sales and customer-service aspect to Castor's job, including the "ability to assist customers with orders, billing and or/collection related issues." Reviewing her medical history, Dr. Rater noted that Castor was "reported to be anxious and/or depressed"; nonetheless, he found no medical evidence of mental-health issues that would rise to the level of disabling her from work. Dr. Rater's conclusion that there was no objective indication of a lack of ability to work at all,

---

that principle here. In *Kalish*, this Court faulted a plan administrator for relying on a doctor's report that concluded that the plaintiff could return to a position requiring "light activity," but which did not explain how the plaintiff could return to her actual position, described by Kalish's employer as "'high stress with many deadlines' and 'includes responsibility for directing all aspects of transportation operations, handling negotiations, travel to other sites, and direct supervision of employees.'" *Id.* Such a job, this Court found, could not "reasonably be found to require only 'light activity.'" *Id.* at 509. In this case, by contrast, we believe that the physical demands of Castor's job were captured by her job description and could also reasonably be described by Dr. Conrad's shorthand: "sedentary, with physical requirements including sitting, typing, and talking." And Dr. Rater's report demonstrated that he understood the sales and customer-service components of Castor's job, which he described as the "ability to assist customers with orders, billing and or/collection related issues." *Kalish* cannot be read to stand for the proposition that a summary is impermissible—that a reviewing doctor's report must recite and evaluate each item listed in a job description—and counsel at oral argument conceded that no such requirement exists. Finally, we do not believe that Castor may reasonably complain that the reviewing doctors failed to appreciate any stressful or skilled components of her job beyond those listed in the job description, as it does not appear that Castor ever brought any such information to Sedgwick's attention. This further distinguishes her case from *Kalish*, for in that case, in addition to providing the disability insurer with a job description, Kalish's supervisor informed the insurer that Kalish's job was a "'high stress position with many deadlines' and significant 'vendor/customer contact.'" *Id.* at 503.

combined with his report's expression that Castor's job required sales and customer-relations skills, is sufficient to demonstrate that he believed Castor mentally able to perform the duties of her job, whether they were skilled or unskilled.[8]

We, therefore, conclude that the reports of the reviewing physicians adequately considered and addressed Castor's job duties and that Sedgwick did not behave arbitrarily and capriciously by relying upon them.

ii.

Castor also challenges Sedgwick's conclusion that she was not disabled as of December 11, 2014. Castor makes a perfunctory argument before this Court that Sedgwick acted arbitrarily and capriciously when it concluded that Castor was not physically disabled as of December 11, 2014. But Castor did not, at any time during the appeal process, attempt to explain why Dr. Conrad's initial report was wrong. Nor did she challenge the opinion of her own cardiologist, Dr. Goyal, that she could return to sedentary work as of December 11, 2014. Indeed, Castor offers no report from a doctor explaining why she was physically disabled from performing the duties of her job. The reviewing internist on appeal, Dr. Perez, agreed with Dr. Conrad's

---

[8] In *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618–20 (6th Cir. 2006), this Court determined that a plan administrator's denial of disability benefits was arbitrary and capricious, in part because the administrator provided a denial letter that was "a mere recitation of medical terminology employed by various physicians in their diagnoses of [the plaintiff's] condition, without any reasoning as to why those diagnoses would permit her to function in the workplace," and because the reviewing doctor "never discussed [the plaintiff's] job duties, which implies that he did not conduct a reasoned evaluation of her condition to determine whether she could perform those duties." Here, however, it is clear that the reviewing doctors read and understood Castor's job duties. Further, all three reviewing doctors determined that she was not disabled and explained why that was so. Indeed, even if the reviewing doctors' reports were not fully consistent with *Elliott*, we would see no need to remand to the plan administrator to have those doctors resubmit reports that make explicit that Castor was not physically disabled from working at her computer or interacting with customers, or that Castor did not have anxiety or depression that would preclude her from talking on the phone or entering sales negotiations with customers. Those conclusions are implicit in the reviewing doctors' reports.

findings. It cannot be said, therefore, that Sedgwick's decision regarding Castor's alleged physical disability, which was based on the unchallenged reviews by Dr. Conrad and Dr. Perez, was arbitrary and capricious.

Likewise, Sedgwick's decision to rely on the independent review of Dr. Rater over Castor's proffered evidence of a psychiatric disability was not arbitrary and capricious. As the district court here recognized, in order to prevail, Castor needed to show that she was disabled from December 11, 2014, when her short-term disability benefits were terminated, to February 10, 2015, when she could be eligible for long-term disability benefits.

Much of Castor's evidence does not fit the relevant time period. Shaw only began seeing Castor near the end of that period, meeting her first on February 2, 2015. It was not until March 2, 2015, that Shaw saw Castor as an outpatient and made a diagnosis regarding her mental health. For that reason, Shaw could not speak personally to Castor's psychiatric disability during the relevant period, save for the eight days between February 2 and February 10. While Shaw concluded that Castor's anxiety was debilitating enough to preclude her from working from February 2015 to June 2015, she could only speculate that Castor suffered from anxiety between December 2014 and February 2015. Similarly, Dr. Lunderman first met with Castor on March 5, 2015, after the benefits period had expired. While he believed that Castor suffered from depression and could not handle stress, conditions he believed severe enough to preclude her from returning to full-time work, Dr. Lunderman could not speak to whether Castor had been disabled as of December 11, 2014, nor did he even attempt to speculate.

This left only Dr. Murphy's diagnosis of anxiety and depression. Sprinkled throughout Dr. Murphy's medical reports are specific episodes of anxiety and depression. And in his opinion letter, Dr. Murphy expressed his belief that Castor's anxiety and depression had been

present since mid-2014, and that her anxiety and depression rendered her unable to perform the duties of her job.

But Dr. Rater, the reviewing psychiatrist on appeal, disagreed. He reviewed Dr. Murphy's reports and conclusions and found that, although Castor reported symptoms of anxiety and depression, those mental-health issues did not prevent her from performing the duties of her job on or after December 11, 2014. He found noteworthy that Dr. Murphy could not verify Castor's complaints regarding lack of concentration or confusion. Even when the reports from Shaw and Dr. Lunderman were considered, Dr. Rater did not believe that Castor had a psychiatric disability that precluded her from working, noting that even though there were self-reported symptoms of depression and anxiety, the mental-health exams did not show "significant pathology" or otherwise indicate a lack of work capacity.

Castor argues that Dr. Rater's report is faulty because Dr. Rater disregarded her self-reported symptoms and subjective evidence in favor of objective medical evidence. More generally, she argues that the pursuit by Sedgwick and the reviewing doctors of objective evidence is inconsistent with the Plan's definition of "Medical Evidence."

But the Plan says otherwise. A "disability" for the purposes of the Plan "must be supported by objective Medical Evidence." The use of "objective" seems to shut the door on the subjective. But if the door is left ajar, the definition of "Medical Evidence" closes it. The Plan defines "Medical Evidence" as:

> Objective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator. Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with generally accepted principles of the health care profession. In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability. For example, reports of intense pain, standing alone, will be

> unlikely to support a finding of Disability, but reports of intense pain associated with an observable medical condition that typically produces pain could be sufficient.

Castor latches on to the last sentence to suggest that subjective evidence is sufficient to establish disability. But that is not so. Medical evidence must be "objective," as demonstrated by the first two sentences. And self-reported symptoms—i.e., the subjective evidence Castor attempts to rely on now—generally will not be considered sufficient, unless accompanied by some objective evidence—an observable medical condition.

Dr. Rater's report did not, therefore, erroneously disregard Castor's self-reported symptoms in pursuit of objective medicine. And in light of the competing reports of Dr. Rater and Dr. Murphy regarding the severity of Castor's mental-health issues, we cannot say that Sedgwick's conclusion that Castor was mentally able to handle the duties of her job was arbitrary and capricious. *See McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th. Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.").

\* \* \*

For these reasons, we AFFIRM the judgment of the district court in favor of AT&T.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Short-term and long-term disability plans offer employees a simple promise: pay premiums now, while you are healthy, and we will pay benefits later, if you become too sick to work. Katherine Castor bought into this promise and kept her part of the bargain. Yet when Castor developed a litany of illnesses in 2014—starting with *Clostridium difficile*, then pneumonia and H1N1, and eventually atrial fibrillation, congestive heart failure, and anxiety, R. 11 (A.R. at 1, 14, 33–34, 41) (Page ID #62, 75, 94–95, 102)—Sedgwick, as the administrator of Castor's disability-benefits plans, repeatedly tried to deny Castor's claim. *Id.* at 11, 17, 38, 57 (Page ID #72, 78, 99, 118). Eventually, Sedgwick consulted with Dr. Chester Conrad, a cardiologist, who concluded that Castor was not disabled "from a cardiology perspective" as of December 11, 2014. *Id.* at 543–46 (Page ID #604–07). Sedgwick issued its final denial of Castor's benefits on December 19, 2014, *id.* at 551–53 (Page ID #612–14), and Castor initiated an administrative appeal.

During the appeal, Sedgwick again asked Dr. Conrad to review Castor's file "from a cardiology perspective," and it cited Dr. Conrad's conclusion that Castor was not disabled in affirming its denial of benefits. R. 11-2 (A.R. at 1406, 1416) (Page ID #1467, 1477). Though Sedgwick also consulted with Drs. Jose Perez, Jr. and Michael Rater to review Castor's file from "an internal medicine standpoint" and "a psychiatry standpoint," it did not ask a new, independent cardiologist to review Castor's cardiac complaints. *Id.* at 1399, 1412 (Page ID #1460, 1473). This is a problem. As the majority recognizes, group-health plans are required to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" when reviewing an appeal from an adverse benefit determination based on a medical judgment, 29 C.F.R. § 2560.503-1(h)(3)(iii), and that individual may not be someone "who was consulted in connection with the adverse benefit

determination that is the subject of the appeal, nor the subordinate of any such individual," *id.* § 2560.503-1(h)(3)(v). By failing to ask anyone other than Dr. Conrad to assess whether Dr. Conrad had correctly concluded that Castor's heart problems did not prevent her from working, Sedgwick violated the basic protections set forth in 29 C.F.R. § 2560.503-1(h)(3).

The majority reaches the opposite conclusion by treating Sedgwick's consultation with Dr. Perez, an internist, as adequate for the purposes of 29 C.F.R. § 2560.503-1(h)(3).[1] Dr. Perez, however, disavowed an ability to opine on the entirety of Castor's cardiac records. In particular, he explained that he could not interpret the notes from Castor's "electrophysiology consult" on January 23, 2015 because such "notes [were] outside of [his] area of expertise." R. 11-2 (A.R. at 1412) (Page ID #1473). Dr. Perez's inability to comment on the January 23 "electrophysiology consult" is all the more noteworthy because Dr. Goyal (Castor's cardiologist) had stated ten days earlier that Castor needed another echocardiogram and had noted that "[i]f there is evidence of worsening ejection fraction or worsening congestive heart failure, she may need to stay on disability." R. 11-1 (A.R. at 1019) (Page ID #1080). It is therefore possible that the results of the January 23 consult touched on the concerns Dr. Goyal raised on January 13, and Dr. Perez's failure to decipher the January 23 notes thereby deprived the plan of important information regarding Castor's health. Avoiding these sorts of holes in the review process is, presumably, why the Department of Labor regulations require plan administrators to consult with an appropriate "health care professional" in the first place.

---

[1] The majority also intimates that Castor may have "abandoned her claim of physical disability" during the administrative appeal by telling Sedgwick that her "primary disability condition is psychiatric." Maj. Op. at 7 & n.4. As the majority acknowledges, Sedgwick specifically told Castor that it would "be reviewing both types of conditions (cardio/psych)" on appeal. R. 11 (A.R. at 114–15) (Page ID #175–76). As a result, Sedgwick may not now justify its failure to comply with 29 C.F.R. § 2560.503-1(h) by arguing that Castor had failed to pursue her cardiac complaints during the administrative appeal. A plan administrator cannot "issue a conclusory denial"—or a denial premised on procedural missteps—"and then rely on an attorney to craft a post-hoc explanation." *Corey v. Sedgwick Claims Mgmt. Servs., Inc.*, 858 F.3d 1024, 1028 (6th Cir. 2017).

The majority dismisses Dr. Perez's limitations by concluding that Castor did not raise this argument before the district court and thereby forfeited it. Castor argued, however, that Sedgwick violated 29 C.F.R. § 2560.503-1 by "hir[ing] improper medical reviewers." R. 17 (Pl.'s Mot. for J. on the A.R. at 3) (Page ID #3422). And even if Castor had not been so explicit, she undeniably raised the *claim* that she now presses here—that Sedgwick violated 29 C.F.R. § 2560.503-1(h)(3), which requires plan administrators to consult with an appropriate "health care professional" on appeal who was not involved in the initial "adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(iii), (v). Having raised this claim before the district court, Castor may now "formulate[] any argument [she] like[s] in support of that claim here." *Yee v. City of Escondido*, 503 U.S. 519, 535 (1992).

For its part, the plan insists that it need not "always consult a specialist to provide a full and fair review of adverse benefits determinations." *Loan v. Prudential Ins. Co. of Am.*, 370 F. App'x 592, 598 (6th Cir. 2010); *see also* Appellee Br. at 35. While perhaps true, a plan should consult a specialist where the claimant raises an issue "that only an expert could adequately address." *Loan*, 370 F. App'x at 598; *see also* M*organ v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003) (holding that physician's opinion that plaintiff's activities were "incompatible with fibromyalgic impairment" were not substantial evidence in favor of plan's denial of benefits because the physician lacked "any expertise or experience whatsoever in dealing with fibromyalgia"). Given that Dr. Perez told Sedgwick that his competence to review Castor's cardiac records was limited, Sedgwick bore the burden of consulting a physician with the proper qualifications. I would therefore remand this case to the district court with instructions to remand to Sedgwick so that Sedgwick can provide Castor with the full and fair review that it previously failed to conduct.

I would remand, also, because Sedgwick failed at every stage of its benefits determination to account adequately for Castor's actual job duties. Our precedent on this point is pellucidly clear: a plan administrator "could have made a reasoned judgment [that Castor could perform her occupation] only if it relied on medical evidence that assessed [Castor's] physical [and psychiatric] ability to perform job-related tasks." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006). "Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability." *Id.* "[M]erely recount[ing] the technical contents of [a claimant's] various medical evaluations," without "reason[ing] from [the claimant's] condition to her ability to perform her occupation" is not enough. *Id.* at 618–19. Despite *Elliott*'s plain rule, none of the reviewing physicians ever considered whether Castor's medical conditions made her unable to work, in light of her *actual* job duties. Dr. Conrad, notably, did not even have access to Castor's job duties when reviewing her file during the initial benefits determination; he relied instead on a boiled-down description of "sedentary, with physical requirements including sitting, typing, and talking." R.11 (A.R. at 543) (Page ID #604). During the appeal phase, all three reviewing physicians purportedly reviewed the list of Castor's job duties, but none then assessed her health problems against the actual demands of her job. *See* R. 11-2 (A.R. at 1397, 1406, 1412) (Page ID #1458, 1467, 1473).

The majority is unbothered by Sedgwick's approach, reasoning first that Dr. Conrad's "shorthand" of "sit, talk, type" adequately captured the physical requirements of Castor's job. *See* Maj. Op. at 9–10. But we have previously rejected plans' efforts to distill claimants' job duties into the overarching category of "sedentary" work when the plan language instead requires—as it does here—that the plan consider whether each claimant can perform the specific duties of his or her job. *See Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 377 (6th Cir.

2011); *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005); *see also* R. 11-4 (A.R. at 1373) (Page ID #3319) (plan summary explaining that "[y]ou are considered Disabled . . . if the Claims Administrator determines that you are Disabled by reason of sickness, pregnancy, or an off-the-job illness or injury that prevents you from performing *the duties of your job*" (emphasis added)). And even if we were not bound by the above precedent, Dr. Conrad's "shorthand" description of Castor's job duties does not, as the majority insists, adequately capture the potential cardiac demands of Castor's job duties. *See* Maj. Op. at 10. For instance, Castor's job duties include possible "premise visits" and a significant amount of customer contact. R. 11-2 (A.R. at 1347) (Page ID #1408). The fact that Castor could perform a job that involves "sitting, typing, and talking" does not mean that Castor could perform a job that requires negotiating with customers, coordinating service arrangements with other departments, and selling products and services. *Cf. Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) (finding "it troublesome" that a consulting physician "ignored the intellectual aspects of Plaintiff's job as a software engineer"); *Kalish*, 419 F.3d at 510 (criticizing Dr. Conrad for concluding that the plaintiff "could return to a position requiring 'light activity'" without considering whether the plaintiff could "return to his 'high-stress' position as Director of National Transportation."). One might imagine that Castor's formal duties implicated far greater cardiac concerns than "sit, talk, type" would imply. Indeed, imagine we must, for Dr. Conrad never opined on this issue one way or the other.

Sedgwick's process during the administrative appeal fares no better. To the majority, "[i]t is evident from each report that the reviewing doctors read and understood Castor's formal job description." Maj. Op. at 11. This conclusion is far from evident to me, given that Dr.

Conrad's sole discussion of Castor's job duties in his second report is the four-word sentence, "Job description was reviewed," R. 11-2 (A.R. at 1406) (Page ID #1467), and Dr. Perez offers the marginally more expansive statement, "The job description for a service representative did not include physical requirements," *id.* at 1412 (Page ID #1473). Though Dr. Ratner actually acknowledged some of Castor's specific duties (i.e., "to assist customers with orders, billing and/or collection related items," R. 11-2 (A.R. at 1397) (Page ID #1458)), he did not explain how Castor's mental health affected her ability to perform those (or other) tasks. And even if the doctors reviewed Castor's job duties, they seemingly never considered how the stress Castor experienced as a result of her job would affect their medical opinions.[2] Ultimately, the majority acknowledges that "the reviewing doctors' reports were not fully consistent with *Elliott*," but nevertheless concludes that remand is unnecessary because the physicians "implicit[ly]" determined that Castor was not disabled from performing her work. Maj. Op. at 12 n.8. This is precisely the sort of process that our case law disallows. We require plans to "reason[] from [a claimant's] condition to her ability to perform her occupation." *Elliott*, 473 F.3d at 619. The plan failed to show its reasoning here. Remand is thus the essential next step. *See id.* at 622.

Finally, I would hold that Sedgwick's determination that Castor lacked a physical or mental disability was arbitrary and capricious. "An administrator acts arbitrarily and capriciously when it 'engages in a selective review of the administrative record to justify a decision to terminate coverage.'" *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015) (quoting *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007)).

---

[2] The majority believes that Castor may not "reasonably complain that the reviewing doctors failed to appreciate any stressful or skilled components of her job beyond those listed in the job description, as it does not appear that Castor ever brought any such information to Sedgwick's attention." Maj. Op. at 11 n.7. But a note from Castor's treating cardiologist to her primary care physician, which appears in Sedgwick's files, stated that Castor was "quite concerned about the high stress level at work causing recurrence of her congestive heart failure. Although the job is sedentary, there is a lot of pressure placed on the employees to meet certain productivity quotas." R. 11-1 (A.R. at 683) (Page ID #744).

Turning first to Castor's heart problems, the record contains no appeal-level review of Castor's health issues from a cardiology perspective—aside, of course, from Dr. Conrad's second report, which never should have been submitted. Even if Dr. Perez, as an internist, were qualified to comment on Castor's cardiac issues, his sole cardiac-based reason for recommending a denial of benefits was that Castor "has been diagnos[ed] with a cardiomyopathy with CHF and AF with initial EF [ejection fraction] of 25–30% and improved to 40%." R. 11-2 (A.R. at 1413) (Page ID #1474). Assuming that an ejection fraction of 40% is a good clinical sign, focusing on this aspect of Castor's charts ignores the evidence pointing in the opposite direction. For instance, after the improved EF, Castor continued to complain of "shortness of breath when walking," R. 11 (A.R. at 572) (Page ID #633), an inability to "walk more than 100 feet before developing symptoms," R. 11-1 (A.R. at 683) (Page ID #744), and "heart palpitations and chest pains," R. 11 (A.R. at 625–26) (Page ID #686–87). On January 13, 2015, Dr. Goyal wrote to Dr. Murphy that he was "not sure what is causing [Castor's] clinical deterioration." R. 11-1 (A.R. at 683) (Page ID #744). Although Sedgwick may ultimately conclude that Castor's cardiac issues are not disabling, it may not do so by selectively examining a single measure of improved heart health and ignoring contrary evidence.[3]

---

[3] Nor may a consulting physician "ignore[] favorable evidence from [the plaintiff's] treating physicians by failing to make a reasonable effort to speak with them." *Shaw*, 795 F.3d at 549. We have previously held that giving treating physicians only twenty-four hours to respond to a request for a teleconference before basing a disability determination "on available medical information" marks an "unreasonable deadline." *Id.* Nevertheless, Dr. Perez stated that he called Dr. Murphy's office "and left a detailed voicemail message requesting a call back within 24 hours," and "indicated that after that time, the report would be completed based on information provided." R. 11-2 (A.R. at 1410) (Page ID #1471). Unsurprisingly, "[n]o call back was received." *Id.* Dr. Perez did not even attempt to contact Castor's other physicians or counsel, including Dr. Goyal, Castor's cardiologist. Although consulting physicians "'are not per se required to interview the treating physician,' the cursory manner in which the Plan attempted to contact [Castor's] treating physicians is evidence that the Plan's decision was not 'the result of a deliberate, principled reasoning process.'" *Shaw*, 795 F.3d at 549 (first quoting *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009); and then quoting *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009)).

Sedgwick's treatment of Castor's mental-health issues is even more troubling. The majority believes that Sedgwick did not err in crediting Dr. Rater's conclusions "over Castor's proffered evidence of a psychiatric disability," in part because "[m]uch of Castor's evidence does not fit the relevant time period." Maj. Op. at 13. The majority is wrong, however, to limit the relevant time period to the months between December 11, 2014 (when Sedgwick initially denied Castor's claims) and February 10, 2015 (when Castor became eligible for long-term disability benefits). When assessing whether a plan acted in an arbitrary and capricious manner, we must review the entire administrative record, and "[t]he administrative record in an ERISA case includes all documentation submitted during the administrative appeals process because this information was necessarily considered by the plan administrator in evaluating the merits of the claimant's appeal." *Kalish*, 419 F.3d at 511. Here, Sedgwick denied Castor's appeal on the ground that she was not unable to perform her job duties "from December 11, 2014 through *present*." R. 11-2 (A.R. at 1417) (Page ID #1478) (emphasis added). Evidence from February 10, 2015 through August 11, 2015, when Sedgwick affirmed its termination of benefits, is therefore relevant.

When the record is viewed as a whole, it is difficult to understand how Sedgwick could credit Dr. Rater's conclusions over those of Castor's treating doctors, given that Dr. Rater's conclusions are in irreconcilable tension with the medical records he purportedly reviewed. For instance, Dr. Rater stated that "[t]here is no report of problems with concentration and attention that would indicate an impact on her work capacity." R. 11-2 (A.R. at 1400) (Page ID #1461). Yet a note to Sedgwick from Dr. Murphy in June 2015 states that "Mrs. Castor was experiencing clear symptoms of anxiety and confusion" by December 22, 2014. R. 11-1 (A.R. at 929) (Page ID #990). He explained that "Castor's anxiety would have disabled her from performing her

occupation . . . . She is unable to focus and maintain attention and concentration due to these symptoms and has maintained a GAF score . . . of 50–55." *Id.* at 930 (Page ID #991). Similarly, Cynthia Shaw (Castor's therapist) stated in June 2015—in a statement given under oath—that Castor's anxiety "was impacting her functioning . . . and her functioning was impaired." *Id.* at 949 (Page ID #1010). Shaw also explained that, after five months of treatment, Castor "still has trouble attending and concentrating." *Id.* at 954 (Page ID #1015). Shaw further opined that Castor's "fear would stop her from being able to be persistent on a task." *Id.* at 942 (Page ID #1003). And Dr. Jack Lunderman, Castor's psychiatrist, noted in a letter to Sedgwick on June 15, 2015 that Castor "experience[s] severe consequences on a frequent basis. . . . Her inability to maintain attention and concentration as well as slowed speech would hinder her ability to deal directly with the public and/or co-workers." *Id.* at 1002–03 (Page ID #1063–64). Dr. Rater did not explain why these findings were clinically insignificant or unpersuasive; he instead pretended that they did not exist. A plan may not "completely ignore[] favorable evidence from [a claimant's] treating physicians" or "reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Shaw*, 795 F.3d at 548–49 (second quote quoting *Elliott*, 473 F.3d at 620). Dr. Rater's, and ultimately Sedwick's, failure to grapple with the evidence and the opinions supplied by Castor's physicians and counselor is a hallmark example of arbitrary-and-capricious decisionmaking.

What is more, Sedgwick relied entirely on a file review of Castor's claims and failed to conduct an in-person examination—a maneuver we have criticized as "particularly 'questionable'" where, as here, the claim "involves a mental illness component." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016) (quoting *Javery*, 741 F.3d at 702)). "Evaluation of mental health necessarily involves 'subjective symptoms,' which are most

accurately ascertained through 'interviewing the patient and spending time with the patient,' such that a purely record review will often be inadequate where a disability claim includes a mental component.'" *Id.* (quoting *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008)).

The majority, however, reasons that Sedgwick could ignore Castor's evidence of subjective, self-reported symptoms because the plan summary requires claimants to provide "objective medical information" to show their disability. *See* Maj. Op. at 14–15. But the plan also states that reports of subjective symptoms "associated with an observable medical condition that typically produces" those symptoms could be sufficient. R. 11-4 (A.R. at 1397) (Page ID #3343). Here, Castor's anxiety and depression are linked to "an observable medical condition"—namely, her congestive heart failure. *See, e.g.*, R. 11-1 (A.R. at 940, 954) (Page ID #1001, 1015) (Shaw explaining that Castor "worries consistently since she's had physical problems about her heart," "shows a fear of dying due to a discovery of her congestive heart failure," and "over-focuses on her physical now as a result of the heart thing, so it gets in her way and it stresses her out"). Under the plain terms of the plan, Sedgwick could not discount or ignore evidence of Castor's anxiety and depression, which resulted from or was exacerbated by her physical deterioration, simply because her mental-health conditions were harder to observe.[4]

\* \* \*

Sedgwick's determination that Castor was able to return to work may ultimately prove correct. But Sedgwick must make that determination in a reasoned way—in the way that its plan documents, the Department of Labor regulations, and our precedents require. Sedgwick's failure

---

[4] In any event, not all of Castor's mental-health evidence was subjective. Dr. Lunderman, for example, noted that "Castor has consistently shown signs of severe depression, and inability to handle stress and with a GAF score of 40–45." R. 11-1 (A.R. at 1002) (Page ID #1063).

to comply with these procedural protections was unlawful, and I would therefore remand this case to the district court with instructions to remand to Sedgwick, so that Sedgwick can provide a full and fair review of Castor's claims. Because the majority disagrees, I respectfully dissent.